### The PENNSYLVANIA RAILROAD COMPANY
v.
### TRANSPORT WORKERS UNION OF AMERICA, A.F.L.–C.I.O., et al.
Civ. A. No. 30792.

United States District Court
E. D. Pennsylvania.
Jan. 30, 1962.

Robert M. Landis, of Dechert, Price & Rhoads, R. N. Clattenburg, Philadelphia, Pa., for plaintiff.

Asher Schwartz, of O'Donnell & Schwartz, New York City, Charles A. Lord, of Richter, Levy, Lord, Toll & Cavanaugh, Philadelphia, Pa., for defendants.

FREEDMAN, District Judge.

Plaintiff seeks a preliminary injunction. A hearing was held on the application on January 25th. At that time defendants filed a cross-motion for a temporary injunction against plaintiff.

### The Facts

The Pennsylvania Railroad Company operates in a thirteen-states area and the District of Columbia running from the Mississippi River to the Eastern Seaboard and from the Great Lakes to the District of Columbia. (N.T. 79.) Its shipments of industrial products and raw materials, as well as perishable foodstuffs, military supplies and mail, make its operations an extremely important factor in the functioning of this part of the country. On Friday, January 12, 1962, plaintiff's board of directors adopted a resolution authorizing its merger with The New York Central Railroad Company. (N.T. 41.) At the same time another resolution was adopted (P-1) authorizing the officers to file an application with the Interstate Commerce Commission for approval of the proposed merger. No such application has yet been filed. (N.T. 41, 42.) A meeting of plaintiff's stockholders at which action is to be taken on the decision of the board of directors is scheduled for May 8, 1962. (N.T. 41.)

Promptly on the announcement of the action of the board of directors, the defendants Michael Quill, Matthew Guinan and Eugene Attreed, on January 15, 1962, sent a telegram to the plaintiff stating that "The Transport Workers Union of America, AFL–CIO, vigorously protest the proposed merger" on the ground that it was "designed to promote the interest of the financial cliques who control both companies in complete disregard of the national welfare and the welfare of the 150,000 employees and their families." It gave this notice: "We solemnly warn you that we will resist to the limit of our capacity, including strike any merger deal which fails to provide ironclad protection of the job security and retirement rights of each and every employee on the seniority rosters of both railroads, their subsidiaries and affiliates. We demand that such ironclad protection be assured by you in writing immediately." (P–3) A joint reply by the presidents of both railroads was made in a telegram of January 17, 1962. It stated that the approval of the stockholders and of the Interstate Commerce Commission was necessary before any merger could take place and that this interval would provide "more than adequate time for an orderly consideration, under normal collective bargaining procedures, of proper protection for employes represented by the TWU and other unions who ultimately may be affected." It declared that "management will welcome the opportunity to meet with the TWU" after there had been developed the necessary facts regarding the organizational structure and plan of operation of the new company which would "permit an intelligent consideration of proper protective conditions by management and the TWU with respect to those employes represented by the latter * * *" (P–4). On January 20, 1962, at a press confer-

ence in New York the defendants, through Mr. Quill, announced a strike against both railroads to begin immediately after midnight on February 4, 1962. (N.T. 50.)

It is clear that a strike by T.W.U. would have widespread effect on freight and passenger services in the thirteen-states area in which the plaintiff operates and would cause plaintiff great losses of revenue. As the date of the threatened strike approaches the loss of business and revenue to the plaintiff will increase. (N.T. 88, 89.) The repercussions of a strike would also leave some lasting results, because not all the customers lost to plaintiff would be recovered after the strike had ended. That all this constitutes immediate and irreparable damage is quite plain and requires no discussion.

### The Law

What is before us is a labor dispute of the most basic character. It is a collision between a giant employer and a union which represents employees who may lose their jobs as a result of the merger. The Norris-LaGuardia Act (29 U.S.C.A. §§ 101–115) bars in general all injunctions in labor disputes. Its theory is that the injunction of a court of equity is not an appropriate instrument for dealing with these sharp economic controversies between employers and employees in which the ultimate weapon of the union is a strike.

The present case, however, does not deal with an ordinary employer and ordinary employees. It deals rather with an industry whose management and work force have been the objects of special Congressional concern and action, both because of the great capital and large number of workers involved, and also because of the vital public interest in its continued operations. Because of this concern Congress adopted the Railway Labor Act in 1926, as amended in 1934 (45 U.S.C.A. § 151 et seq.). By this statute industrial relations of railroad carriers were placed in a special category under a carefully designed plan, whose basic purpose is to avoid interruption of commerce by insuring both industrial peace and the bargaining rights of employees. Congress expressly declared this general purpose (See Railway Labor Act, § 2, 45 U.S.C.A. § 151a), and imposed the duty upon all carriers and employees "to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or *otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.*" (Railway Labor Act, § 2, First, 45 U.S.C.A. § 152.) Provision was made for the resolution of disputes and grievances arising out of existing collective bargaining agreements (known as "minor" disputes) through negotiation between the carrier and the collective bargaining representatives of the employees, with decision ultimately to be made by the Railroad Adjustment Board or the System Board of Adjustment established by the employer and the union jointly (§ 3, First (m), 45 U.S.C.A. § 153). Disputes arising from conflict over the negotiation of new provisions or matters outside of existing agreements (known as "major" disputes) are also dealt with in the statutory plan (45 U.S.C.A. § 156). As to these, Congress made clear two principles. One is that in such "major" disputes there must be negotiation and conciliation. The other is that the union may not be coerced into any agreement nor deprived of its ultimate right to strike. In effect, therefore, Congress declared that there should be no outbreak of economic warfare by way of strike before its detailed and elaborate procedures for negotiation and conciliation were first exhausted. Thus for "minor" disputes Congress established a compulsory system of adjudication by tribunals representative of both employer and employees. For "major" disputes it did not adopt a compulsory system of adjudication, but instead established channels for negotia-

tion and conciliation whose use it made mandatory.

The present controversy is a "major" dispute and under the statutory system the procedure which must be followed is this: a carrier or union which seeks a change in the collective bargaining agreement must give at least thirty days written notice for a conference, which must be held within the thirty day period. (Railway Labor Act, § 6, 45 U.S.C.A. § 156.) If the dispute is not adjusted by the parties in conference, either party may invoke the services of the National Mediation Board, and if its efforts to bring about an amicable settlement through mediation prove unsucccessful the Mediation Board must endeavor to induce the parties to submit their controversy to arbitration. If the parties do not agree to arbitration the Board must notify them that its mediatory efforts have failed and for thirty days thereafter no change may be made in the rates of pay, rules or working conditions or established practices in effect prior to the time the dispute arose (Railway Labor Act, § 5, 45 U.S.C.A. § 155). Finally, all else having failed, the Mediation Board is required, if in its judgment the dispute threatens "substantially to interrupt interstate commerce to a degree such as to deprive any section of the country of essential transportation service", to notify the President who, in his discretion, may create an Emergency Board to investigate the facts and make a report to him within thirty days after its creation. For an additional thirty days after the creation of the Emergency Board and for thirty days after it has made its report to the President the parties to the controversy may make no change, except by agreement, in the conditions out of which the dispute arose (Railway Labor Act, § 10, 45 U.S.C.A. § 160).

The Congressional purpose is therefore clear that the parties to a railway labor dispute must follow the statutory path. This statutory purpose has been authoritatively held to authorize the Federal Courts, notwithstanding the Norris-LaGuardia Act, to forbid by injunction either party to a railway labor dispute from turning away from the ordained channels for the mandatory adjudication of their "minor" disputes. Brotherhood of Locomotive Engineers v. Missouri-K.-T. R. Co., 363 U.S. 528, 531, 80 S.Ct. 1326, 4 L.Ed.2d 1435 (1960); Brotherhood of Railroad Trainmen v. Chicago River & Indiana Railroad Co., 353 U.S. 30, 39–42, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957); Baltimore & Ohio Railroad Company v. United Railroad Workers Division of Transport Workers Union of America, 271 F.2d 87, 92 (2d Cir. 1959); Pennsylvania Railroad Company v. Transport Workers Union of America, 178 F.Supp. 30, 33 (E.D.Pa.1957). And while the authorities are not so numerous nor do they speak in the same emphatic terms, it is equally plain that Federal Courts have the authority and, indeed the duty, to enjoin resort to self-help before the parties have exhausted those processes of conciliation and mediation which Congress has established for "major" disputes. In such cases "[the] parties are required to submit to the successive procedures designed [by the Act] to induce agreement. * * * But compulsions go only to insure that those procedures are exhausted before resort can be had to self-help." Elgin, J. & E. R. Co. v. Burley, 325 U.S. 711, 725, 65 S.Ct. 1282, 1291, 89 L.Ed. 1886 (1945). This also is the plain effect of the recent decision of our Court of Appeals in Pennsylvania Railroad Co. v. Transport Workers Union of America, 280 F.2d 343 (3d Cir. 1960), affirming 191 F.Supp. 915 (E.D.Pa. 1960). See also Norfolk & P. B. L. R. Co. v. Brotherhood of Railroad Trainmen, 248 F.2d 34, 44–45 (4th Cir. 1957); Railroad Yardmasters of America v. Pennsylvania Railroad Company, 224 F. 2d 226 (3d Cir. 1955); American Airlines, Inc. v. Air Line Pilots Association, 169 F.Supp. 777, 787 (S.D.N.Y.1958).

The strike which has been threatened in reply to the merger proposal therefore must be enjoined so that the controversy may be confined within the procedures prescribed by the Railway

Labor Act. In keeping the parties within this statutory path the Court does not, and may not, direct what their conclusions shall be, nor indeed require any conclusions of them. It may well be that all of the processes established under the Railway Labor Act will prove to be an open-ended channel through which the parties will pass without the resolution of their dispute, and there will therefore continue to loom during their journey through the statutory process the ultimate possibility of a strike. Congress did not consider such a journey a vain act and its will must be obeyed.

Whether the merger of these railroads is desirable and what consideration should be given to the effect of its consummation on the job security of the employees is a question of profoundly important economic and social policy and manifestly is of grave concern to the employees, but it is not for us to decide. Congress has conferred the authority to make this decision upon the Interstate Commerce Commission. Section 5(2) (f) of the Interstate Commerce Act (49 U.S.C.A. § 5(2)) provides: "As a condition of its approval * * * of any [merger] involving a carrier or carriers by railroad * * * the Commission shall require a fair and equitable arrangement to protect the interests of the railroad employees affected." [1] See Brotherhood of Maintenance of Way Employes v. United States, 366 U.S. 169, 81 S.Ct. 913, 6 L.Ed.2d 206 (1961), where the subject was reviewed.

We express no opinion on the merits of the controversy, which will be the subject of discussion in the negotiations between the parties and in the conciliatory function of the Mediation Board should they fail to arrive at an agreement between themselves.

■ Defendants ask us to enjoin the plaintiff from submitting the merger proposal to its stockholders and from applying to the Interstate Commerce Commission for approval. We may not interfere with the jurisdiction of the Interstate Commerce Commission to pass upon the merger, a jurisdiction which Congress has conferred upon it. Nor may we prohibit the plaintiff from submitting the decision of its board of directors to its stockholders for their vote. The stockholders, as the owners of the corporation, may vote in favor of the merger or against it, and we must assume that the Interstate Commerce Commission will properly discharge its statutory function.

■ Finally, defendants urge us to condition any injunction we may issue against a strike with a prohibition against the plaintiff's discharge of any employees. For this they cite Brotherhood of Locomotive Engineers v. Missouri-K.-T. R. Co., 363 U.S. 528, 80 S.Ct. 1326, 4 L.Ed.2d 1435 (1960) and the so-called "oilers" case: Baltimore & Ohio Railroad Co. v. United Railroad Workers Division of Transport Workers Union of America, 176 F.Supp. 53 (S.D.N.Y.1959), reversed in 271 F.2d 87 (2d Cir. 1959), and in turn vacated and remanded in 364 U.S. 278, 80 S.Ct. 1609, 4 L.Ed.2d 1719 (1960). In both of these cases, however, the railroad had actually dismissed the employees. In the present case the merger, although approved by the board of directors of the plaintiff, is far from effectuated. The stockholders' meeting is not scheduled until May 8, 1962, and there is no indication that any furloughs of employees are planned at this time in anticipation of the merger. On the contrary, the evidence indicates that plans for combined operations are still un-

---

1. The Statute continues: "In its order of approval the Commission shall include terms and conditions providing that during the period of four years from the effective date of such order such transaction will not result in employees of the carrier or carriers by railroad affected by such order being in a worse position with respect to their employ- ment, except that the protection afforded to any employee pursuant to this sentence shall not be required to continue for a longer period, following the effective date of such order, than the period during which such employee was in the employ of such carrier or carriers prior to the effective date of such order."

formulated (N.T. 93–4; see also the telegram of the presidents of both railroads (P–4)) and there is no contradiction of the plaintiff's evidence through Mr. Alexander, its Director of Labor Relations, that at this time it has taken no action toward reducing its work force in anticipation of the merger. (N.T. 64–5.) Mr. Attreed's affidavit and testimony (N.T. 94, et seq.) on behalf of the union show only its concern that these results will ultimately follow. Accordingly it is urged by the plaintiff that since there is no proof of immediate irreparable injury to the defendants no conditions may be attached to the injunction it seeks. We need not now decide what the ultimate standard may be and its application to plaintiff's motion or defendants' cross-motion. The injunction plaintiff seeks will restrain a strike threatened to be called next week. Any conditions now imposed would deal only with matters that are still far away in the future, if they exist at all. Our Decree will permit application to be made for such relief should later developments reveal the imminence of a real and substantial threat of layoffs in anticipation of the merger.

### Action on Requests

The Facts and the Law as stated in the foregoing Opinion shall be deemed Findings of Fact and Conclusions of Law.

In addition, the parties have stipulated their agreement to plaintiff's Requests for Findings of Fact Nos. 1, 2, 3, 4, 5, 16 (a) and 17(a). They are affirmed.

The parties have also stipulated their agreement to defendants' Requests for Findings of Fact Nos. 1, 2, 3 (as modified by the parties), 4, and 6 (as modified by the parties) to which we add at the end thereof, "or as a result of the proposed merger". They are affirmed.

We also affirm plaintiff's Requests for Findings of Fact Nos. 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16(b), with the substitution of "important" for "imperative", 17 (b) (as modified by plaintiff), 18, and 21.

We also affirm defendants' Requests for Findings of Fact Nos. 8, 9, 10, and 12 (as modified by defendants).

We affirm plaintiff's Requests for Conclusions of Law Nos. 1, 2, 3, 4, 5, 6, 7, and 9.

We affirm defendants' Request for Conclusion of Law No. 2.

All other Requests by either party are severally denied.

We are entering a Preliminary Decree in conformity with this Opinion.

### DECREE

AND NOW, January 30, 1962, after hearing on plaintiff's motion and defendants' cross-motion for preliminary injunction, plaintiff's motion is granted and defendants' cross-motion is denied;

AND IT IS HEREBY ORDERED AND DECREED that defendant, Transport Workers Union of America, A.F.L.-C.I.O. (hereinafter called TWU), defendant Local 2013, and individual defendants Michael J. Quill, Eugene Attreed, Andrew Kaelin, C. A. Quigley, John W. Mellon, Jr., W. S. Usner, V. J. Elliott, E. D. Halstead, H. T. Flood, William Friel, Anthony Fanucchi, W. W. Wilson, Joseph Singleton and Dominick Barone, individually and as representatives of (a) all the membership of the United Railroad Workers Division of TWU, (b) all of the TWU Local Unions on plaintiff's system, and (c) all of the members of the TWU employed on plaintiff's system, and each of them, their agents, servants, attorneys and employees, and all persons acting in concert or participation with them, be and they are hereby restrained and enjoined until final hearing and judgment, or until further order of this Court:

(1) from threatening or calling, from authorizing, encouraging, furthering, supporting, participating in, approving or continuing any strike or work stoppage, or slow down against plaintiff; and

(2) from picketing the premises on which the plaintiff conducts its operations, from interfering with ingress to or egress from said premises including

the delivery, unloading, loading, dispatch and movement of plaintiff's rolling stock and equipment and the contents thereof or from congregating at or near any approaches thereto.

AND IT IS FURTHER ORDERED AND DECREED that the said defendants take all steps within their power to prevent said threatened strike or work stoppage from occurring or from continuing if commenced.

Security in the amount of $5,000 shall be entered by plaintiff.

Jurisdiction of this cause is retained for the purposes of enabling any of the parties to apply to the Court for such further orders and directions as may be necessary or appropriate for the modification of any of the provisions of this Decree, or for the enforcement of compliance with its terms, or for the addition of any conditions to this Decree.