**ATLANTA AND WEST POINT RAIL-ROAD COMPANY and Western Railway of Alabama**

v.

**UNITED TRANSPORTATION UNION, an unincorporated labor union, and C. M. Cagle, 1999 Meador Avenue, S.E., Atlanta, Georgia, individually, and as representative of such class.**

**Civ. A. No. 13269.**

United States District Court
N. D. Georgia,
Atlanta Division.

Jan. 5, 1970.

---

Lamar W. Sizemore, and William H. Major, Heyman & Sizemore, Atlanta, Ga., for plaintiffs.

Hugh Gibert and Richard N. Hubert, Haas, Holland, Freeman, Levison & Gibert, Atlanta, Ga., for defendants.

## ORDER

EDENFIELD, District Judge.

This action for injunctive relief was instituted on November 15, 1969, by Plaintiffs Atlanta and West Point Railroad Company and Western Railway of Alabama (hereinafter referred to collectively as A & W P) to enjoin the allegedly unlawful picketing and work stoppage which defendants on that day had instituted on the properties of plaintiffs and along the lines where plaintiffs' trains are operated. A temporary restraining order issued on November 15th was continued until December 4th by consent of

the parties and following a hearing on that date was continued pending issuance of this court's ruling. Defendants' answer and counterclaim for injunctive relief against the carriers were filed on December 16, 1969.

Plaintiffs are carriers engaged in interstate commerce within the meaning of the Railway Labor Act (45 U.S.C. § 151 et seq.). Defendant United Transportation Union (UTU) is an unincorporated labor organization and is the recognized bargaining agent for firemen and certain other railway employees of both plaintiffs. Defendant Cagle is named as a defendant both individually and as a representative of those of plaintiffs' employees who are represented by the UTU.

The dispute between the parties centers around an apprentice-engineer program which the union proposed to the carriers in November 1965, pursuant to § 6 of the Railway Labor Act (45 U.S.C. § 156), and raises questions as to whether (1) the carriers' negotiation of a contract regarding an apprentice-engineer program with another union, after Defendant UTU's § 6 notice was filed, constituted a change in the status quo and therefore justified the use of self-help by defendants, and, if not, as to whether (2) either party's mere refusal to bargaining good faith, standing alone, would justify the use of self-help by the other party.

The record shows that there is an existing collective bargaining agreement which was entered into between plaintiffs and Defendant UTU's predecessor— the Brotherhood of Locomotive Firemen and Engineers (BLFE)—in 1957, and which provides for rates of pay, rules, regulations, and working conditions under which plaintiffs' firemen, hostlers, and hostler helpers are employed. Rule 37 of that agreement provides that fire-

men *shall be afforded an opportunity for promotion to engineers* after they have passed certain required examinations and have met certain prescribed conditions. The agreement was last amended in 1959, but in November 1965 the UTU served notice on plaintiffs of its desire to effect certain changes in the existing contract. The proposed changes were presented in the form of three § 6 notices, all of which were served on the same day, but the present controversy is concerned almost entirely with what is generally referred to as Notice No. 3, relating to the establishment of an apprentice-engineer training program.[1]

The record shows further that during the summer of 1969 the union which represents plaintiffs' engineers, *i. e.,* the Brotherhood of Locomotive Engineers (BLE), also served the carriers with a § 6 notice indicating a desire to bargain with regard to an apprentice-engineer training program and that plaintiffs and the BLE subsequently entered into a bargaining agreement based upon that union's proposal. Defendants now contend that by negotiating with the engineers plaintiffs have altered the status quo with respect to the firemen and thereby have violated § 2, Seventh, of the Railway Labor Act (45 U.S.C. § 152, Seventh), which provides that "No carrier * * * shall change the rates of pay, rules, or working conditions of its employees, as a class, as embodied in agreements except in the manner prescribed in such agreements or in section 156 of this title [i. e., § 6 of the Act]." For the reasons set forth below, the court rejects that contention and finds that the carriers' actions in negotiating this contract do not constitute a violation of the Railway Labor Act.

There is at present no dispute regarding the bargainability of the subject

---

1. At about the same time, similar notices were served on carriers throughout the country by other local units of the UTU. In subsequent litigation Notices 1 and 3 were judicially determined to present bargainable, and Notice 2 nonbargainable, issues. Brotherhood of Railroad Train-

men v. Akron & B.B.R.R., 128 U.S. App.D.C. 59, 385 F.2d 581 (1967); Brotherhood of Locomotive Firemen & Engineers v. National Mediation Board, 133 U.S.App.D.C. 326, 410 F.2d 1025 (1969).

matter contained in defendants' Notice No. 3, but plaintiffs correctly contend that the subject of an apprentice-engineer program is bargainable with both the BLE and the UTU [2] and that their contract with the BLE in no way affects either their ability or their desire to bargain with the UTU on the same subject matter. Having bargained with the engineers, plaintiffs are still free (and indeed have a duty) to bargain with the firemen. Although the apprenticeship agreement which plaintiffs have with the engineers makes certain provisions which would be applicable to firemen if they entered the program under that contract, it is conceivable that after bargaining between the carriers and firemen has taken place an entirely separate apprenticeship agreement will be set up to cover firemen who wish to become apprentices.[3]

Furthermore, to the extent that defendants allege that plaintiffs have changed *future* working conditions they have not brought themselves within either § 2, Seventh, of the Act or within any of the sections which set forth the status quo duties imposed by the Act when a major dispute is involved. Section 2, Seventh, is not among the latter provisions; it merely states one category of cases in which the major dispute provisions must be invoked. Detroit & Toledo Shore Line Co. v. United Transportation Union, 396 U.S. 142, 90 S.Ct. 294, 24 L.Ed.2d 325 (Dec. 9, 1969),[4] and it applies only to changes in *existing agreements*. The status quo duties, on the other hand, prevent changes in *existing working conditions*, whether they are covered by the existing agreement or not, once the major dispute machinery of the Railway Labor Act has been set into motion.[5] Neither § 2 Seventh, nor any of the status quo sections (§§ 5, 6, or 10), is applicable unless the change complained of is a change in conditions which existed at the time the dispute arose, *i. e.*, at the time the § 6 notice was served.

To the extent that they allege that plaintiffs' contract with the engineers changes the firemen's *present* work rules the defendants are in error. Even if the terms of the two contracts clearly conflicted, plaintiffs could not change the firemen's working conditions merely by entering into a contract (with another union) which purported to do so; the change of conditions would occur only if and when the carriers undertook to implement such changes with regard to the firemen. The firemen's interest in becoming engineers is protected by their existing bargaining agreement, Rule 37 of which provides that firemen shall be afforded an opportunity to be promoted to engineers. Despite the apprenticeship agreement which the carriers have

2. The Court of Appeals for the District of Columbia made this clear in a recent, related case when it noted that since both the firemen and the engineers have an interest in the training of apprentice engineers, until a carrier has bargained with both groups the National Mediation Board would have no basis upon which to make a craft or class determination with respect to the apprentices. Brotherhood of Locomotive Firemen & Engineers v. National Mediation Board, 133 U.S. App.D.C. 326, 410 F.2d 1025, 1034 (1969).

3. The actual program might, of course, include employees covered by both agreements.

4. "The purpose of § 2, Seventh, is twofold: it operates to give legal and binding effect to collective agreements, and it lays down the requirement that collective agreements can be changed only by the statutory procedures. The violation of this section is a criminal offense punishable by imprisonment or fine or both. Violations of the status quo provisions of §§ 5, 6, and 10 are only civil wrongs." Detroit & Toledo Shore Line Co. v. United Transportation Union, 396 U.S. 142, 156, 90 S.Ct. 294, 302 (Dec. 9, 1969).

5. "The obligation of both parties during a period in which any of these status quo provisions is properly invoked is to preserve and maintain unchanged those actual, objective working conditions and practices, broadly conceived, which were in effect prior to the time the pending dispute arose and which are involved in or related to that dispute." *Id.* 396 U.S. at 152–153, 90 S.Ct. at 300–301.

negotiated with the engineers, the firemen are free to negotiate their own apprenticeship agreement with the carriers and need never enter the training program under the BLE—carrier agreement if they choose not to do so. There is no evidence whatever that the carriers have made any change in existing working conditions, and it necessarily follows that they have not violated the status quo.

With respect to the second question presented, i. e., the refusal to bargain, all parties agree that bargaining has not yet taken place with regard to the contract changes which were proposed in defendants' November 1965 Section 6 notices, and they also agree that this results from a refusal to bargain.[6] The union, of course, contends that the carriers refused, while the carriers contend that the union refused.

■ Under the evidence presented the court concludes that at one time or another both refused. Thus although several conferences were held with regard to defendants' Notice No. 3, it is undisputed that at those meetings the merits of the union's proposal were never discussed; instead, the meetings were devoted to discussions as to whether the issue was a bargainable one and, if so, whether the bargaining conferences should simultaneously consider all of the union's proposals, and a counterproposal which the carriers had made, or whether the discussion should be confined to the changes proposed in the union's Notice No. 3. With respect to the positions taken by the respective parties during these conferences it also appears, and indeed is undisputed, that although the carriers initial-

ly took the position that the union's combination proposal of November 15, 1965, was "premature, unlawful, and non-bargainable," they later expressed willingness to begin preliminary discussions on the union's November 15th proposals.[7] The carriers viewed all notices served by the union on November 15th as constituting a single § 6 notice and insisted upon their right to discuss concurrently both that notice and their own counterproposal of January 1966. The union, on the other hand, viewed each notice as entirely independent of the others and refused to discuss them concurrently. This conflict was never resolved and the evidence shows that at least as early as February 22, 1966, Mr. T. F. Carr, General Chairman of the union's local Grievance Committee, stated in a letter to Mr. Bowie, the carriers' Director of Personnel, that conferences on the union's proposals had been terminated some time prior to that date and could not be reopened.

The union now contends, however, that the carriers have been in violation of the Railway Labor Act since November 1965 in that they have consistently refused to bargain with regard to their § 6 Notices No. 1 and No. 3. Notice No. 2, of course, has been held nonbargainable and is not at issue here.

In the first place, and to the extent that it makes any difference, the court cannot completely agree that, under the evidence, it was the carriers which have consistently refused to bargain with respect to the defendant union's § 6 notice. It is true that when the § 6 notice was first served in 1965[8] these carriers,

6. No question of good-faith bargaining is involved. It would be inappropriate to consider, before bargaining has even begun, what effect, if any, the carriers' contract with the engineers might have on the question of good-faith bargaining. Furthermore, the services of the National Mediation Board cannot be invoked until bargaining has taken place and an impasse has been reached, (45 U.S.C. § 155.) unless the Mediation Board dockets the case for mediation on the national level as it has been requested to do.

7. Letter dated January 31, 1966, from Marshall L. Bowie, Director of Personnel and Assistant to General Manager of both railroads, to T. F. Carr, General Chairman of UTU's predecessor (BLFE).

8. The court makes no finding as to the viability of a § 6 notice served in 1965 as respects a strike based thereon nearly four years later in 1969. In view of the other findings in this opinion, the court treats the notice as still being valid.

along with other carriers, took the position that the issue was a nonbargainable one. In fact, certain of the other carriers along with other unions caused litigation to be instituted to resolve this question and a judgment was ultimately entered finding in favor of bargainability.[9] While this litigation was pending it appears that all parties held off awaiting the outcome, but even before the litigation was over it also appears that the plaintiff carriers here wrote the defendant union expressing willingness to begin negotiations if all notices (both proposals and counterproposals) could be considered together (see letter of 1/31/66 referred to in fn. 7, supra). Thereafter on February 22, 1966, the union replied, rejected this offer and saying that conferences on the union's proposals had been terminated some time prior to that date and could not be reopened. As respects formal (written) offers to negotiate there the matter rested on both sides until the strike was called on November 15, 1969, some three years and nine months later.[10]

■ In the view of the court, however, it makes no difference who first refused to negotiate in any event. Apparently the defendant union would now treat the abortive discussions between the parties *about* negotiations as a substitute *for* negotiations and as an exhaustion of the procedural requirements of the RLA so that it now may strike. This view, however, misconceives the entire scheme of the Railway Labor Act. What the Act positively requires, where a major dispute is involved, is genuine, good-faith negotiations, and neither a refusal to negotiate, nor an agreement not to negotiate nor a dispute about negotiations will suffice. If either party refuses to negotiate it may be compelled to do so by mandatory injunction. This is necessarily true, else the whole elaborate "cooling-off" procedures set up by the Act could be set at naught at the whim of either party, disrupting interstate commerce and fomenting the very evils which the Act was designed to prevent.

As the Fifth Circuit held in its most recent opinion, in which it concluded that unlawful self-help by one party does not automatically justify retaliatory self-help by the other party:

> "The cooling-off policies of the major dispute procedures cannot be effectuated by allowing both parties simply to do away with the Act." [11]

This appears to be the holding of all the cases. Thus as one court has said:

> " * * * [T]he Railway Labor Act imposes a mandatory duty upon both carrier and union to follow its procedures in the case of major disputes. *While agreement is not compulsory the steps required by the Act are.* In the event that either party refuses to follow them it has failed to follow the plain mandate of Congress and has breached the duty which Congress imposed upon it. Injunctive relief is required to 'vindicate' [the Act] * *." (Emphasis added.) American Airlines, Inc. v. Air Line Pilots Ass'n. D.C., 169 F.Supp. 777, 787 (cited by 5th Cir. in United Industrial Workers, etc., v. Board of Trustees, etc., 400 F. 2d 320).

This also accords with the statement of Judge (now Mr. Justice) Marshall that:

> " 'The legislative history (of the Railway Labor Act) indicates that when the rail unions and carriers agreed upon these provisions, the unions surrendered their rights to strike pending exhaustion of major dispute procedures in exchange for a statutory

---

9. *See* Brotherhood of Locomotive Firemen & Engineers v. National Mediation Board, 133 U.S.App.D.C. 326, 410 F.2d 1025, *supra.*

10. It is true, however, that at the hearing the head of the union did testify that thereafter at one or more chance meetings he did orally mention further negotiations which were refused.

11. National Airlines, Inc. v. International Ass'n of Machinists and Aerospace Workers, 416 F.2d 998 (1969).

provision restraining management from disturbing the status quo.'" Rutland Ry. Corp. v. Brotherhood of Locomotive Engineers (2nd Cir. 1962), 307 F.2d 21, 43, quoted by Fifth Circuit in United Industrial Workers, etc. v. Board of Trustees, etc., 400 F.2d 320 at 323.

■ It follows that, there having admittedly been no negotiations, they must be begun; and in the meantime the Act must be "vindicated." That is to say, the carriers must be enjoined from refusing to negotiate and from refusing to comply with the other mandatory provisions of the Act and the union must be enjoined from striking pending such compliance, unless in the meantime the carriers should unilaterally alter existing working conditions or otherwise disturb the status quo.

■ Nothing in the Norris-La-Guardia Act bars such relief. That Act does not bar the issuance of mandatory injunctions to compel recalcitrant parties to comply with the mandatory provisions of the Act.[12] Nor does it bar injunction against unlawful self-help by either party pending compliance therewith.[13] Under the Act, parties to a major dispute have a right to use self-help once the Act's mandatory procedures have been exhausted.[14] But self-help is lawful only if the party using it has complied with those provisions; if it has not done so the self-help is unlawful and may be enjoined despite the Norris-LaGuardia Act.[15]

Nor do the cases in which an injunction was denied militate against this conclusion. Thus in both America Airlines, Inc v. Air Line Pilots Ass'n, supra, and in Brotherhood of Railroad Trainmen v. Toledo, Peoria & Western R. R., 321 U.S. 50, 64 S.Ct. 413, 88 L.Ed. 534 (cited by defendants), the strike came *after* protracted negotiations, not *before*, and an injunction against the strike was consequently denied. Finally, in United Industrial Workers of Seafarers, etc. v. Board of Trustees, etc., supra, an injunction was denied because there the carrier had changed existing working conditions and disturbed the status quo by selling its facilities and discharging certain employees. Under these circumstances, of course, the strike was legal and could not be enjoined. In short, the conclusion is inescapable that these cases in no way alter the rule that if neither party to a major dispute has bargained in good faith, both are subject to a mandatory injunction compelling negotiation and that self-help by either would be unlawful and enjoinable in the meantime.

Applying the foregoing to the facts of the instant case, in which the parties agree that no bargaining has in fact taken place but with each party asserting that it was the other party who refused to bargain, one fact at least is crystal clear, i. e., the bargaining which the Railway Labor Act requires has never materialized and as a result disruption of commerce is threatened. Assuming for the moment that it was the plaintiffs who refused to bargain, absent a unilateral change in the status quo by the plaintiffs the defendants would not be entitled to use coercive self-help, although they clearly are entitled to a mandatory injunction compelling the carriers to confer The court has rejected defendants' contention that the carriers changed the status quo by bargaining with the engi-

12. *See, e. g.*, Brotherhood of Railroad Trainmen v. Howard, 343 U.S. 768, 72 S.Ct. 1022, 96 L.Ed. 1283 (1952); Brotherhood of Railroad Trainmen v. Chicago River & Indiana R.R., 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957).

13. United Industrial Workers of Seafarers Intl. v. Board of Trustees of Galveston Wharves, 400 F.2d 320 (5th Cir. 1968), cert. denied, 395 U.S. 905, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969); American Airlines, Inc. v. Air Lines Pilots Ass'n Intl., 169 F.Supp. 777 (S.D.N.Y.1958).

14. Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969).

15. *Id.*; American Airlines, Inc. v. Air Lines Pilots Ass'n Intl., 169 F.Supp. 777 (S.D.N.Y.1958).

neers' union regarding a matter which has been held bargainable as to both the engineers and the fireman,[16] and there is no allegation that the carriers have changed the status quo in any other manner.

■ Holding as we do that the carriers' mere refusal to bargain, standing alone, would not provide a lawful basis for a strike, it follows that we need not decide which party is the culprit, or indeed whether both parties have failed to fulfill their statutory obligation to confer. The court notes, however, that under their existing bargaining agreement with the firemen the carriers are under a continuing duty to promote all qualified firemen to engineers and the conditions under which the firemen have been promoted must not be changed unilaterally, whether provided for in the existing agreement or not. Detroit & Toledo Shore Line Co. v. United Transportation Union, supra. It follows, therefore, that the firemen may not be required to participate in the training program which the BLE and carriers have negotiated. On the other hand, the union—having filed notice in November 1965 of several areas in which it wishes to bargain—cannot now insist that each area must be negotiated without reference to the other, unless of course notice has been withdrawn as to the areas about which it does not now wish to bargain.

Accordingly, an injunction will issue against the union until the statutory procedures have been followed and until further order of the court, and both parties shall proceed forthwith to make a good-faith effort to settle in conference their differences with regard to all bargainable proposals for changes which the union served upon plaintiffs in November 1965.

It is so ordered.

16. Brotherhood of Locomotive Fireman & Engineers v. National Mediation Board,

133 U.S.App.D.C. 326, 410 F.2d 1025, 1033–1034 (1969).