439 F.2d 73
 76 L.R.R.M. (BNA) 2603, 64 Lab.Cas. P 11,513
 ATLANTA AND WEST POINT RAILROAD COMPANY and Western Railway
of Alabama, Plaintiffs-Appellees,
v.
UNITED TRANSPORTATION UNION, an unincorporated labor union
and C. M. Cagle, etc., Defendants-Appellants.
 No. 29638.
 United States Court of Appeals, Fifth Circuit.
 Feb. 19, 1971.
 
 Hugh W. Gibert, Richard N. Hubert, Edward L. Greenblatt, and R. C. Freeman, III, Atlanta, Ga., for defendants-appellants.
 William H. Major, Ralph G. McCallum, Jr., Atlanta, Ga., for plaintiffs-appellees.
 Before BELL, DYER and RONEY, Circuit Judges.
 DYER, Circuit Judge:
 
 
 1
 The United Transportation Union appeals from the District Court's order preliminarily enjoining a strike during a labor dispute with the Atlanta and West Point Railroad and the Western Railway of Alabama.[1] Essentially the union contends that these railroads had no standing to seek, and the District Court had no power to issue, an injunction because the carriers had not complied with the Norris-LaGuardia Act 8, 29 U.S.C.A. 108,[2] or the Railway Labor Act 2, Third, and 6, 45 U.S.C.A. 152, Third, 156.[3] We affirm.
 
 
 2
 The dispute sub judice evolves from the often hostile milieu and fiery history of union-management relationships in the railroad industry: the incipiency of conflict between the firemen[4] and the railroads loosely coincided with the birth of Rudolf Diesel more than a century ago. Brotherhood of Locomotive Firemen & Enginemen v. Central of Georgia Ry., 5 Cir. 1969, 411 F.2d 320, 321. We need not here repeat the historical narrative which others have already published. E g., Brotherhood of R. R. Trainmen v. Akron & Barberton Belt R.R., 1967, 128 U.S.App.D.C. 59, 385 F.2d 581, 588-592, cert. denied, 1968, 390 U.S. 923, 88 S.Ct. 851, 856, 19 L.Ed.2d 983. Instead, we shall confine our explication to events comprising the factual context of this particular controversy.
 
 
 3
 On November 15, 1965, the Brotherhood of Locomotive Firemen and Enginemen served upon the Atlanta and West Point Railroad and the Western Railway of Alabama three section 6 notices[5] proposing changes in the existing collective bargaining agreement. The present controversy is concerned primarily with Notice No. 3, which pertained to establishment of an apprentice-engineer training program for firemen.
 
 
 4
 Responding to the Union's proposals, the railroads scheduled a conference. During this and subsequent meetings, they contended that the Union's requests were 'premature, unlawful, and nonbargainable.'[6] Later, however, management expressed willingness to begin preliminary discussions but, viewing all notices served on November 15, as constituting a single section 6 notice, insisted on concurrent consideration of the railroads' counterproposal of January 1966.[7] The Union rejected this invitation since it deemed the notices mutually independent. Indeed, on February 22, 1966, T. F. Carr, general chairman of the Union's local grievance committee, stated in a letter to Marshall L. Bowie, the carriers' personnel director, that conferences concerning the Union's proposals had been terminated prior to that date and could not be reopened. Although Carr later modified his position with regard to the training program, the record discloses no formal attempt to reopen negotiations. Consequently the merits of Notice No. 3 have never been discussed.
 
 
 5
 The District Court found that, at one time or another, both parties refused to resume negotiations concerning the bargainability of Notice No. 3. The court plausibly concluded that the hiatus resulted because all concerned were awaiting the outcome of litigation, instituted by other unions and other carriers, to determine the bargainability of Notice No. 3. Necessarily antecedent to the resolution of this issue was an answer to the question whether any union-- the Brotherhood of Locomotive Firemen and Enginemen and the Brotherhood of Locomotive Engineers were specifically concerned-- possessed the exclusive right to contractually arrange an apprentice-engineer program with the carriers. Finally, in Brotherhood of Locomotive Firemen & Enginemen v. National Mediation Board, 1969, 133 U.S.App.D.C. 326, 410 F.2d 1025, 1032, cert. denied, 396 U.S. 878, 90 S.Ct. 149, 24 L.Ed.2d 136, the District of Columbia Circuit held 'that the Firemen's Section 6 notice concerning engineer apprenticeship programs * * * was bargainable under the Railway Labor Act.'[8]
 
 
 6
 On November 7, 1969, little more than two weeks after the Supreme Court denied certiorari in the above case, the National Railway Labor Conference, which represents the railroads involved here and other carriers, sent the United Transportation Union a written offer to negotiate, and suggested a time and place for the meeting. The Union's international president replied on November 12 that the Union was not prepared to consider the matter on a national basis. He concluded that the 'suggestion for a meeting (concerning Notice No. 3 should) be sent to the General Chairmen of those General Committees which served that Notice.' On November 14, the Union's international vice-president arrived in Montgomery, Alabama. On November 15, he informed the general chariman of the Union on the Atlanta and West Point Railroad and the Western Railway of Alabama that a strike would commence at 6:00 a.m. that morning.
 
 
 7
 The strike was short-lived. During the evening of November 15, the District Court for the Northern District of Georgia issued a temporary restraining order. That order was continued by consent of the parties until December 4. Following a hearing on that date, the temporary order remained in force pending issuance of the court's ruling. On January 5, 1970, the court decided that the union had mistakenly treated 'the abortive discussions between the parties about negotiations as a substitute for negotiations and as an exhaustion of the procedural requirements of the RLA so that it now may strike.' 307 F.Supp. at 1210. According to the district judge, the Railway Labor Act requires good-faith negotiations as a prerequisite to the exercise of self-help by either party. Therefore, the carriers must be enjoined from refusing to negotiate and from refusing to comply with the Act's other mandatory provisions; and the Union must be enjoined from striking pending such compliance, unless in the meantime the carriers should unilaterally alter existing working conditions or otherwise disturb the status quo. Id. at 1211. The court concluded:
 
 
 8
 Accordingly, an injunction will issue against the union until the statutory procedures have been followed and until further order of the court, and both parties shall proceed forthwith to make a good-faith effort to settle in conference their differences with regard to all bargainable proposals for changes which the union served upon plaintiffs (railroads) in November 1965.
 
 
 9
 Id. at 1212.
 
 
 10
 Appealing this order pursuant to 28 U.S.C.A. 1292(a)(1), the Union argues that the District Court erred both in its findings of fact and in its application of the law. The appeal rests on three grounds: First, the four year delay between the Union's section 6 notices and the railroads' offer to negotiate conclusively indicates that the carriers have not made 'every reasonable effort' to settle the dispute, a requirement of the Norris-LaGuardia Act, section 8. Having failed to satisfy this condition precedent, the railroads had no standing to seek injunctive relief. Second, because the carriers unilaterally changed one of the terms or conditions of the firemen's employment in violation of the Railway Labor Act, section 6, the Norris-LaGuardia Act, section 8, precluded any injunction against the strike. Finally, by negotiating with the Engineers rather than the Firemen with regard to the apprentice-engineer program, the railroads attempted to 'interfere with, influence, or coerce' their employees in violation of the Railway Labor Act, section 2, Third. The District Court's order rewarded the railroads for engaging in such illegal activity. We find each of these conclusions untenable.
 
 
 11
 Section 4 of the Norris-LaGuardia Act, 29 U.S.C.A. 104, specifically provides: 'No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute * * *.' By its terms this prohibition is absolute. Nevertheless, the Supreme Court has recognized a duty to reconcile the policies underlying the Norris-LaGuardia Act with those underlying the Railway Labor Act. E.g., Brotherhood of R. R. Trainmen v. Chicago River & Indiana R.R., 1957, 353 U.S. 30, 40-42, 77 S.Ct. 635, 1 L.Ed.2d 622; Virginian Ry. v. System Federation No. 40, 1937, 300 U.S. 515, 563, 57 S.Ct. 592, 81 L.Ed. 789; see Boys Markets, Inc. v. Retail Clerks Union, Local 770, 1970, 398 U.S. 235, 251-252, 90 S.Ct. 1583, 26 L.Ed.2d 199. Recently the Court noted:
 
 
 12
 The heart of the Railway Labor Act is the duty, imposed by 2 First upon management and labor, 'to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes * * * in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.'
 
 
 13
 The Act provides a detailed framework to facilitate the voluntary settlement of major disputes. * * * While the dispute is working its way through these stages, neither party may unilaterally alter the status quo.
 
 
 14
 Brotherhood of R. R. Trainmen v. Jacksonville Terminal Co., 1969, 394 U.S. 369, 377-378, 89 S.Ct. 1109, 1115, 22 L.Ed.2d 344; see Detroit & Toledo Shore Line R.R. v. United Transportation Union, 1969, 396 U.S. 142, 90 S.Ct. 294, 24 L.Ed.2d 325; National Airlines, Inc. v. International Association of Machinists & Aerospace Workers, 5 Cir. 1969, 416 F.2d 998, 1000-1002; United Industrial Workers, v. Board of Trustees of Galveston Wharves, 5 Cir. 1968, 400 F.2d 320, 323-324, cert. denied, 1969, 395 U.S. 905, 89 S.Ct. 1747, 23 L.Ed.2d 219; cf. Brotherhood of R. R. Trainmen v. Chicago River & Indiana R.R., supra (minor dispute). That a major goal of the Railway Labor Act is the prevention of work stoppages in the transportation industry should not require reiteration. See, e.g., Texas & New Orleans R.R. v. Brotherhood of Ry. & Steamship Clerks, 1930, 281 U.S. 548, 561, 50 S.Ct. 427, 74 L.Ed. 1034; United Industrial Workers, etc. v. Board of Trustees of Galveston Wharves, supra, 400 F.2d at 329. '(The) procedures of the Act are purposely long and drawn out, based on the hope that reason and practical considerations will provide in time an agreement that resolves the dispute.' Brotherhood of Ry. & Steamship Clerks, etc., v. Florida East Coast Ry., 1966, 384 U.S. 238, 246, 86 S.Ct. 1420, 1424, 16 L.Ed.2d 501; accord, Brotherhood of R. R. Trainmen v. Akron & Barberton Belt R.R., supra, 385 F.2d at 597.
 
 
 15
 By striking, the Union unquestionably altered the status quo. To effectuate the policies of the Railway Labor Act, the District Court had jurisdiction to provide temporary injunctive relief until the disputants had exhausted the Act's procedures. Piedmont Aviation, Inc. v. Air Line Pilots Association, 4 Cir. 1969, 416 F.2d 633, 636, cert. denied, 1970, 397 U.S. 926, 90 S.Ct. 924, 25 L.Ed.2d 105; see Long Island R.R. v. System Federation No. 156, 2 Cir. 1966, 368 F.2d 50, 52-53; Flight Engineers' International Association, A.F.L.-C.I.O. v. American Airlines, Inc., 5 Cir. 1962, 303 F.2d 5, 11; Pennsylvania R.R. v. Transport Workers Union, E.D.Pa.1962, 202 F.Supp. 134, 137-138; cf. R.R. Yardmasters of America v. Pennsylvania R.R., 3 Cir. 1955, 224 F.2d 226. Undeniably, when the Union struck, the parties had exhausted none of the Act's procedures. Discussions concerning the bargainability of Notice No. 3 were not a satisfactory substitute for negotiations concerning the merits of that notice. Consequently the validity of the court's exercise of jurisdiction does not hinge upon classification of the dispute as either 'major' or 'minor.'[9] See, e.g., Piedmont Aviation, Inc. v. Airline Pilots Association, supra. In either event, under the circumstances of this case, the District Court properly assumed jurisdiction.
 
 
 16
 The Union, however, argues that although the court may have had jurisdiction, it had no power to provide temporary injunctive relief. Relying on Brotherhood of R. R. Trainmen, Enterprise Lodge No. 27 v. Toledo, Peoria & Western R.R., 1944, 321 U.S. 50, 64 S.Ct. 413, 88 L.Ed. 534, and United Industrial Workers, etc., v. Board of Trustees of Galveston Wharves, supra, the Union contends that the carriers lacked the 'clean hands' necessary to gain an injunction. Thus section 8 of the Norris-LaGuardia Act precluded such a remedy. To substantiate its claim, the Union avers that the railroads' agreement with the Brotherhood of Locomotive Engineers regarding an apprentice-engineer program[10] was a unilateral change in the terms or conditions of the firemen's employment which violated section 6 of the Railway Labor Act. Moreover, this agreement was a manifestation of the carriers' efforts to destroy the Firemen's Union, a violation of section 2, Third, of the Railway Labor Act. If either of these observations was factually supportable, the union arguments might have merit.
 
 
 17
 In Enterprise Lodge No. 27, supra, a union struck after negotiation and mediation had failed and the railroad had refused to arbitrate. The Supreme Court held that section 8 of the Norris-LaGuardia Act prohibited an injunction to terminate the strike: 'Arbitration under the Railway Labor Act was available, afforded a method for settlement Congress itself had provided, and until (the railroad) accepted this method it had not made 'every reasonable effort to settle' the dispute, as Section 8 requires.' 321 U.S. at 65, 64 S.Ct. at 421. The Court noted:
 
 
 18
 (Section 8) imposes two conditions. If a complainant has failed (1) to comply with any obligation imposed by law or (2) to make every reasonable effort to settle the dispute, he is forbidden relief. * * *
 
 
 19
 * * * Section 8 is not limited to railway labor disputes. But it includes them. And its very terms show they were used in explicit contemplation of the procedures and machinery then existing under the Railway Labor Act and with the intent of making their exhaustion conditions for securing injunctive relief, not singly or alternatively, but conjunctively or successively, when available.
 
 
 20
 Id. at 56-58, 64 S.Ct. at 417. To fortify its holding, the Court relied partly on congressional debates preceding passage of the Norris-LaGuardia Act. Representative LaGuardia, who sponsored the bill in the House, commented:
 
 
 21
 There is (a) tie-up between the provisions of the railroad labor act and the necessity of exhausting every remedy to adjust any difference which might arise. The workers could not and would not think of going on strike before all of the remedies provided in the law have been exhausted. If the railroads have complied, they would not * * * be deprived of any relief which they may have in law or equity.
 
 
 22
 75 Cong.Rec. 5504. Crucial to the Court's rationale is the fact that at the time the railroad sought to enjoin the strike, it was also refusing to arbitrate. Thus the union had exhausted every available avenue to agreement and was free to resort to self-help, whatever the consequences. See Brotherhood of R. R. Trainmen v. Jacksonville Terminal Co., supra, 394 U.S. at 377-380, 89 S.Ct. 1109; Brotherhood of Ry. & Steamship Clerks, etc., v. Florida East Coast Ry., supra, 384 U.S. at 243-244, 86 S.Ct. 1420; Brotherhood of Locomotive Engineers v. Baltimore & Ohio R.R., 1963, 372 U.S. 284, 289-291, 83 S.Ct. 691, 9 L.Ed.2d 759; Elgin, Joliet & Eastern Ry. v. Burley, 1945, 325 U.S. 711, 725, 65 S.Ct. 1282, 89 L.Ed. 1886.
 
 
 23
 In Order of R. R. Telegraphers v. Chicago & Northwestern Ry., 1960, 362 U.S. 330, 80 S.Ct. 761, 4 L.Ed.2d 774, the Court upheld a district court's decision that section 8 of the Norris-LaGuardia Act had deprived it of the power to permanently enjoin a strike. The district court had found that the complainant railroad was engaged in a continuing refusal to bargain concerning the subject matter of a section 6 notice. Furthermore, the union had exhausted every procedure available under the Railway Labor Act.
 
 
 24
 To the extent that the Union relies on Galveston Wharves, supra, to buttress its section 8 argument, it is mistaken. Judge Wisdom, writing for this Court, concluded that the Norris-LaGuardia Act was inapplicable to the Galveston Wharves controversy. 400 F.2d at 331 n. 33. Moreover, with regard to the Railway Labor Act, Galveston Wharves does not deviate from the rationale of Enterprise Lodge No. 27, supra, and its progeny. It is true that even though bargaining had not begun, this Court upheld a union's right to strike pending the carrier's compliance with the Act. Nevertheless, the factual underpinning for this decision cannot be overlooked: the carrier had leased facilities and discharged employees without notice, thereby destroying the status quo in violation of the Act. Consequently, 'under the Act, the Union had the right to strike; that right continues until the Act is complied with by the Carrier, and thereafter ceases during and until exhaustion of the procedures set up by the Act.' 400 F.2d at 333; see Detroit & Toledo Shore Line R.R. v. United Transportation Union, supra, 396 U.S. at 150-155, 90 S.Ct. 294. In National Airlines, Inc. v. International Association of Machinists & Aerospace Workers, supra, this Court again noted that the union's right to strike is terminable when the carrier has complied with the Act. Applying the Galveston Wharves rationale to the facts in that case, Judge Thornberry wrote:
 
 
 25
 It is conceivable that the strike at the time of the first hearing was lawful. The Union, however, did not contest the initial strike injunction. In any event, the Carrier promptly complied with the January 18 temporary restraining order, issued contemporaneously with the strike injunction, and was therefore in compliance with the Act. The strike, however, continued and was, therefore, even under the Galveston Wharves rationale, in violation of the Act and properly enjoinable from that point forward, if not before. 416 F.2d at 1003 n. 4; see Rutland Ry. v. Brotherhood of Locomotive Engineers, 2 Cir. 1962, 307 F.2d 21, 39 n. 11, cert. denied, 1963, 372 U.S. 954, 83 S.Ct. 949, 9 L.Ed.2d 978.
 
 
 26
 In the case sub judice, we fail to discern why section 8 of the Norris-LaGuardia Act should have deprived the District Court of power to issue a temporary injunction. Application of section 8 would have contributed nothing, under these circumstances, to reconciliation between the Norris-LaGuardia Act and the Railway Labor Act. Instead, it would have served merely to emasculate the latter. Neither National Airlines, supra, nor Galveston Wharves, supra, demands, or sanctions, such disregard for the legislative goals of the Railway Labor Act. Indeed, assuming arguendo that the railroads alone were culpable for the four year delay between delivery of Notice No. 3 and their offer to bargain, that they were ready to negotiate at the time the Union struck remains uncontroverted. Since the disputants had not exhausted the procedures established by the Railway Labor Act, Galveston Wharves, supra, and National Airlines, supra, required that the strike be enjoined. The District Court, cognizant of its duty, refused to shirk the responsibility: its quid pro quo injunction ensured not only that the work stoppage would end but also that the railroads would negotiate in good faith. The court's order did not foreclose future self-help, once the Act's procedures were exhausted or a violation of the Act occurred.[11]
 
 
 27
 Furthermore, we fail to perceive how the railroads' agreement with the Engineers concerning an apprentice-engineer program changed the terms or conditions of the firemen's employment, and thus justified the strike. At the time they exercised self-help, the Firemen had not even begun to negotiate concerning the merits of their proposed program, nor had the Engineers tried to include firemen in their program. Therefore, it was too early to speculate as to what effect the Engineers' agreement would have on the firemen's traditional expectation of promotion to the job of engineer. For the moment, Rule 37 of the Firemen's collective bargaining agreement with the carriers protected their promotional interest.[12] It follows that there could have been no provable change in the status quo. Until the Firemen have negotiated their own training agreement with the railroads, it is even conceivable that the brotherhoods can discard sibling rivalries and implement an apprentice-engineer program satisfactory to all concerned. Such accommodation may not be possible, but it is conceivable.
 
 
 28
 Finally, it would be ludicrous to hold that the railroads' undertaking of a statutory duty to bargain with the Engineers constituted an attempt to 'interfere with, influence, or coerce' firemen, a violation of the Railway Labor Act, section 2, Third. The record shows that the carriers negotiated with the Engineers in response to a section 6 notice. To say that the performance of this legal obligation was illegal is a non sequitur to which we cannot subscribe. That the railroads may have been derelict in their duty to bargain with the Firemen concerning a similar section 6 notice is irrelevant to our resolution of this issue.
 
 
 29
 Concurring in Brotherhood of Locomotive Firemen & Enginemen v. National Mediation Board, supra, Judge (now Chief Justice) Burger stated:
 
 
 30
 Today's result places the carriers in the unhappy position of having to deal simultaneously with two rival unions whose bargaining demands will very likely conflict if a high order of union statesmanship is not forthcoming. Moreover, since both Unions have now been given the right to serve Section 6 notices, the disappointed Union will have the right to strike once the statutory procedures are exhausted. The Carriers will be able neither to avoid nor to resolve a strike by agreeing with the striking union without the risk of violating its obligation not to depart unilaterally from its agreement with the other Union. Although I consider this to be a wholly unsatisfactory resolution I can find nothing in the statute which permits the Court to impose a different result.
 
 
 31
 410 F.2d at 1035; cf. Transportation-Communication Employees Union v. Union Pacific R.R., 1966, 385 U.S. 157, 87 S.Ct. 369, 17 L.Ed.2d 264; Slocum v. Delaware, Lackawanna & Western R.R., 1950, 339 U.S. 239, 70 S.Ct. 577, 94 L.Ed. 795; Order of Ry. Conductors of America v. Pitney, 1946, 326 U.S. 561, 567, 66 S.Ct. 322, 90 L.Ed. 318. The Railway Labor Act and National Mediation Board, supra, have impaled the carriers on the horns of a bargaining dilemma.[13] Now the Union asks us to inform these railroads that one horn is legally more comfortable than the other. This we refuse to do. While National Mediation Board, supra, vindicated the Union's right to bargain with regard to Notice No. 3, it did not give the Firemen an exclusive right to negotiate an apprentice-engineer program, nor did it authorize self-help prior to exhaustion of the Act's procedures.
 
 
 32
 Accordingly, we conclude that the District Court did not abuse its discretion when it preliminarily enjoined the strike in question. See Piedmont Aviation, Inc. v. Air Lines Pilots Association, supra; Flight Engineers' International Association v. American Airlines, Inc., supra, 303 F.2d at 11; cf. Seaboard World Airlines, Inc. v. Transport Workers Union, 2 Cir. 1970, 425 F.2d 1086, 1091-1092. On November 15, 1969, neither party had the right to resort to self-help to resolve this dispute. See Flight Engineers' International Association v. American Airlines, supra; cf. Northern Pacific Ry. v. Brotherhood of Locomotive Engineers, D.Minn.1970, 308 F.Supp. 995, 997-998. The District Court's order is
 
 
 33
 Affirmed.
 
 
 
 [1]
 The District Court's Order is reported at 307 F.Supp. 1205
 
 
 [2]
 Section 8 of the Norris-LaGuardia Act provides:
 No restraining order or injunctive relief shall be granted to any complainant who has failed to comply with any obligation imposed by law which is involved in the labor dispute in question, or who has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration.
 29 U.S.C.A. 108.
 
 
 [3]
 Section 2 of the Railway Labor Act provides in pertinent part:
 Third. Representatives, for the purposes of this chapter, shall be designated by the respective parties without interference, influence, or coercion by either party over the designation of representatives by the other; and neither party shall in any way interfere with, influence, or coerce the other in its choice of representatives. * * *
 Seventh. No carrier * * * shall change the rates of pay, rules, or working conditions of its employees, as a class, as embodied in agreements except in the manner prescribed in such agreements or in section 156 of this title (section 6 of the Act).
 45 U.S.C.A. 152, Third, Seventh. Section 6 of the Act provides:
 Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions, and the time and place for the beginning of conference between the representatives of the parties interested in such intended changes shall be agreed upon within ten days after the receipt of said notice, and said time shall be within the thirty days provided in the notice. In every case where such notice of intended change has been given, or conferences are being held with reference thereto, or the services of the Mediation Board have been requested by either party, or said Board has proffered its services, rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has been finally acted upon * * * by the Mediation Board, unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board.
 45 U.S.C.A. 156.
 
 
 [4]
 The United Transportation Union's predecessor, the Brotherhood of Locomotive Firemen & Enginemen, negotiated the current collective bargaining agreement between the firemen and these railroads in 1957. 307 F.Supp. at 1207
 
 
 [5]
 See note 3 supra
 
 
 [6]
 The railroads asserted that they could not negotiate with respect to these notices while Award 282 was in effect. For discussion of this congressionally inspired award and refutation of the railroad's position, see Brotherhood of R. R. Trainmen v. Akron & Barberton Belt R.R., supra
 
 
 [7]
 The railroads' counterproposal is of no moment to the ultimate resolution of this controversy
 
 
 [8]
 During the summer of 1969, the Brotherhood of Locomotive Engineers served these railroads with a section 6 notice indicating their desire to bargain concerning an apprentice-engineer program. The railroads and the Engineers subsequently entered a bargaining agreement based upon that union's proposal. 307 F.Supp. at 1207. Implementation of the agreement was scheduled for November 1969
 
 
 [9]
 The 'major'-'minor' distinction evolved from Elgin, Joliet & Eastern Ry. v. Burley, 1945, 325 U.S. 711, 722-723, 65 S.Ct. 1282, 89 L.Ed. 1886. It is not articulated in the Railway Labor Act. Judge (now Mr. Justice) Marshall has stated:
 The words 'major' and 'minor' have no intrinsic legal significance. They are derived from the terminology of railway industrial relations and are used judicially merely as a shorthand way of referring to a distinction incorporated in the structure of the Railway Labor Act. The statute, itself, however, does not use the words. The distinction is of legal significance solely because the Act establishes mutually exclusive mandatory procedures to be followed in resolving two different kinds of disputes.
 Rutland Ry. Corp. v. Brotherhood of Locomotive Engineers, 2 Cir. 1962, 307 F.2d 21, 42-43 (dissenting opinion), cert. denied, 1963, 372 U.S. 954, 83 S.Ct. 949, 9 L.Ed.2d 978.
 The courts have provided sundry interpretations of the distinction between the two types of dispute. See, e.g., Railway Express Agency, Inc. v. Brotherhood of Railway, Airline & Steamship Clerks, 5 Cir. 1971, 437 F.2d 388. United Industrial Workers, etc., v. Board of Trustees of Galveston Wharves, 5 Cir. 1965, 351 F.2d 183, 188-189; St. Louis, San Francisco & Texas Ry. v. R. R. Yardmasters, 5 Cir. 1964, 328 F.2d 749, 752-753, cert. denied, 377 U.S. 980, 84 S.Ct. 1886, 12 L.Ed.2d 748; Rutland Ry. v. Brotherhood of Locomotive Engineers, supra, 307 F.2d at 33-34.
 
 
 [10]
 See note 8 supra
 
 
 [11]
 See generally Risher, 'The Railway Labor Act,' 12 B.C.Ind. & Com.L.Rev. 51 (1970); Wimberly, 'The Labor Injunction-- Past, Present, and Future,' 22 So.Car.L.Rev. 689, 698-723 (1970)
 
 
 [12]
 Rule 37 provides that firemen shall be afforded an opportunity for promotion to engineers after they have passed required examinations and met prescribed standards
 
 
 [13]
 Concerning the equities of the National Mediation Board decision Chief Judge Brown has remarked:
 This sequel concerns the internecine, intramural, probably non-fraternal dispute between the two Brotherhoods as to which gets the Apprentice Engineer craft and the dilemma facing the Carriers in recognition and bargaining. With the collective apologia of the Court's principal spokesman, Judge J. Skelly Wright, and special sentiments of Judges Burger and Tamm, the Court may itself be giving its decision the characterization that it is bound to be right because it is so wrong in result.
 Brotherhood of Locomotive Firemen & Enginemen v. Central of Georgia Ry., 5 Cir. 1969, 411 F.2d 320, 322 n. 1. Others have argued that the Railway Labor Act itself needs repair and have recommended alternative legislation. See Risher, supra note 11; Silberman, 'National Emergency Disputes-- The Considerations Behind a Legislative Proposal,' 4 Ga.L.Rev. 673 (1970).