**BROTHERHOOD OF LOCOMOTIVE FIREMEN AND ENGINEMEN,**
**Appellant,**

**v.**

**NATIONAL MEDIATION BOARD et al.,**
**Appellees.**

**NATIONAL MEDIATION BOARD,**
**Appellant,**

**v.**

**BROTHERHOOD OF LOCOMOTIVE ENGINEERS, Appellee.**

**Nos. 22050, 22185.**

United States Court of Appeals District of Columbia Circuit.

Argued Jan. 15, 1969.

Reargued Feb. 5, 1969.

March 14, 1969.

Petition for Rehearing Denied April 29, 1969.

Mr. Joseph L. Rauh, Jr., Washington, D. C., with whom Messrs. John Silard, Washington, D. C., Daniel H. Pollitt, Chapel Hill, N. C., Isaac N. Groner, Washington, D. C., Alex Elson, Willard J. Lassers and Aaron S. Wolff, Chicago, Ill., were on the brief, for appellant in No. 22,050.

Mr. Walter H. Fleischer, Atty., Department of Justice, with whom Asst. Atty. Gen., Edwin L. Weisl, Jr. and Mr. John C. Eldridge, Atty., Department of Justice, were on the brief, for the National Mediation Board, appellant in No. 22,185 and appellee in No. 22,050.

Mr. Francis M. Shea, Washington, D. C., with whom Messrs. Richard T. Conway, David W. Miller, Washington, D. C., and James A. Wilcox, Omaha, Neb., were on the brief, for railroad appellees in No. 22,050.

Mr. Barclay D. McMillen, Washington, D. C., with whom Mr. Harold A. Ross, Cincinnati, Ohio, was on the brief, for appellee Brotherhood of Locomotive Engineers.

Before BURGER, WRIGHT and TAMM, Circuit Judges.

J. SKELLY WRIGHT, Circuit Judge:

The judgment of the District Court under review here relieves certain railroad companies of any duty to bargain over a proposal submitted to them by the Brotherhood of Locomotive Firemen and Enginemen (the Firemen), and enjoins the Firemen from striking to force such bargaining. The District Court has viewed the Firemen's proposal as creating a representational dispute with the Brotherhood of Locomotive Engineers (the Engineers), rather than as a matter for collective bargaining with the railroads, and has ordered the National Mediation Board to decide the dispute under Section 2, Ninth, of the Railway Labor Act.[1] We reverse.

---

1. 45 U.S.C. § 152, Ninth (1964). The District Court's findings of fact, conclusions of law and decree are reported in Brotherhood of Locomotive Engineers v. National Mediation Board, D.D.C., 284 F.Supp. 344 (1968).

## I

For many years, the railroad industry has recruited virtually all locomotive engineers from the ranks of locomotive firemen. As firemen have moved up the seniority ladder within their craft, they have learned the skills of an engineer while working in the locomotive cab. They have taken examinations administered by the carriers, and those who passed the examinations have, in the order of their seniority as firemen, gained status as engineers. Persons newly qualified as engineers have not normally been immediately employed as such; rather they have continued to work as firemen until the demand for active engineers has reached far enough down the seniority list of that craft to encompass them. With seasonal fluctuations in the demand for engineers, the employees at the bottom of the engineer seniority list "ebb and flow" back and forth between serving as engineers and as firemen.

Both the Engineers' and the Firemen's unions have included in their collective agreements with the carriers provisions regulating the progress of employees from fireman to engineer, including the process of "ebb and flow" for those employees near the bottom of the engineer list and near the top of the fireman list. Most engineers have a fireman's seniority number as well as an engineer's number, and many locomotive enginemen are members of both the Firemen's and the Engineers' unions.

Recent events have made it no longer possible for all new engineers to be supplied from the ranks of active firemen. In 1959 the carriers proposed to eliminate the position of fireman for freight and yard service, a proposal which the Firemen resisted. After winding its way through the mediatory procedures of the

Railway Labor Act for some years without resolution, the dispute threatened to erupt into a strike in 1963. At that point Congress determined to settle the dispute by compulsory arbitration; Board 282 was established, with power to bind the parties to its resolution of the disputed issues for a two-year period. Board 282's award permitted the carriers to eliminate up to 90 per cent of the firemen's jobs in freight and yard service. While the award was in effect (between early 1964 and early 1966), the carriers managed to eliminate about 18,000 firemen's jobs, far more than had been expected.[2]

Such a large scale elimination of firemen made it clear that further sources of new engineers would have to be found for the future. In early 1965 the Firemen's union, operating from the premise that the craft's traditional role as supplier of engineers gave it a bargainable interest in future engineer training programs, proposed apprenticeship plans to the Louisville & Nashville and Southern Pacific Railroads under Section 6 of the Railway Labor Act.[3] In November 1965 the Firemen proposed similar plans under Section 6 to over a hundred other rail carriers.

Service of these notices provoked objection from the Engineers' union. The Engineers claimed to be the exclusive representative of any future apprentice engineers, and asserted exclusive bargaining jurisdiction over all programs for training engineers. They warned the carriers not to bargain with the Firemen over the proposed plan. When the carriers did not reply to the Firemen's Section 6 notice, the Firemen sought the mediatory services of the National Medi-

2. A fuller history of the dispute summarized here can be found in this court's opinion in Brotherhood of Railroad Trainmen v. Akron & Barberton Belt R. Co., 128 U.S.App.D.C. 59, 385 F.2d 581 (1967), cert. denied, 390 U.S. 923, 88 S.Ct. 851, 852, 19 L.Ed.2d 983 (1968).

3. 45 U.S.C. § 156 (1964):
"Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions * * *. * * * *"

ation Board under Section 5 of the Act,[4] and the Board docketed the request and scheduled mediation between the Firemen and the L & N and Southern Pacific companies.

In the meantime, the L & N negotiated an agreement with the Engineers for an apprenticeship progam, the details of the program to be left to management discretion. The Engineers were recognized by the railroad as the bargaining representative for the new class of apprentices. Since the bringing of this suit in the District Court, the Great Northern Railway Company has entered into a similar agreement with the Engineers and very recently has set in motion its own apprentice program.

The Firemen objected to the L & N entering into an agreement with the Engineers before it bargained with the Firemen concerning their similar proposal. They brought suit in the Eastern District of Kentucky to enjoin the implementation of the Engineers—L & N agreement. The court dismissed the suit for want of jurisdiction. That judgment was affirmed by the Sixth Circuit on the ground that the case involved a jurisdictional dispute which, under applicable Supreme Court precedents, was for the

National Mediation Board to decide (if indeed it could be decided in any official forum).[5]

The carriers,[6] arguing that they were caught in a dilemma by the competing claims of the rival unions, sought the mediatory services of the National Mediation Board under Section 5

"in order that they may be properly and legally informed as to which of the two disputing organizations may legally bargain for and on behalf of apprentice locomotive engineers."

The Board declined the carriers' request for mediation, stating that "[t]he question as posed involved a question of representation. Such issues are resolved under Section 2, Ninth * * *."[7]

Section 2, Ninth, of the Railway Labor Act, the key statutory provision involved in this case, places upon the National Mediation Board the duty to investigate "any dispute * * * among a carrier's employees as to who are the representatives of such employees" and to certify to the parties and to the carrier the name of the true representative. The Supreme Court has held that, while the Board's decisions on the merits under this section are unreviewable by the courts,[8] its statutory duty to "investigate" the

---

4. 45 U.S.C. § 155 (1964):

   *"First. Disputes within jurisdiction of Mediation Board.*

   "The parties, or either party, to a dispute between an employee or group of employees and a carrier may invoke the services of the Mediation Board in any of the following cases:

   "(a) A dispute concerning changes in rates of pay, rules, or working conditions not adjusted by the parties in conference.

   "(b) Any other dispute not referable to the National Railroad Adjustment Board and not adjusted in conference between the parties or where conferences are refused.

   &ast; &ast; &ast; &ast; &ast;

   "In either event the said Board shall promptly put itself in communication with the parties to such controversy, and shall use its best efforts, by mediation, to bring them to agreement.
   &ast; &ast; &ast;"

5. Brotherhood of Locomotive Firemen & Enginemen v. Louisville & Nashville R. Co., 6 Cir., 400 F.2d 572 (1968), cert. denied, 393 U.S. 1050, 89 S.Ct. 689, 21 L.Ed.2d 692 (1969).

6. The carriers in question were the L & N and the Southern Pacific, the first two carriers upon which the Firemen had served their § 6 notices. Both had refused to bargain with the Firemen over the notices.

7. The reason given by the Board for declining to offer mediatory services under § 5, First, appears to conflict with its later decision that no § 2, Ninth, representational dispute existed. The apparent conflict is discussed *infra*, Note 10.

8. Switchmen's Union of North America v. National Mediation Board, 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61 (1943).

disputes in question can be judicially enforced.[9]

After the Board had rejected the carriers' request for mediation, the Engineers requested a Board decision under Section 2, Ninth. As the Engineers viewed the situation, a dispute existed between them and the Firemen over who represented the apprentice engineers employed by the L & N. And in the Engineers' view, this dispute fell within the purview of Section 2, Ninth.

The Board, however, found that no Section 2, Ninth, dispute actually existed, so that it lacked jurisdiction to certify a representative.[10] A this point, the Board's posture was as follows: (1) It had declined to advise the carriers which of the unions represented the apprentices under the guise of Section 5 mediation. (2) It had declined the Engineers' request to settle the same question under Section 2, Ninth. (3) It had granted the Firemen's request to mediate the dispute created by the carriers' refusal to bargain over the Firemens' proposed apprenticeship program, and had scheduled mediation between the Firemen and the carriers.

The Engineers, joined in part by the carriers, then brought the present suit. They sought to compel the Board to settle the jurisdictional dispute under Section 2, Ninth, to prevent the carriers and the Firemen from bargaining over the Firemen's apprenticeship proposal, and to enjoin the Firemen from striking to compel such bargaining. Pleadings and affidavits were received by the District Court, and on cross-motions for summary judgment the court found for the Engineers and granted the relief sought.[11]

In our view, the District Court's orders rest upon two erroneous conclusions of law. It concluded first that:

"* * * The apprentice notices served by the BLF&E [Firemen] upon the carrier defendants and many other carriers are valid and bargainable under the Railway Labor Act * * * only if the BLF&E is the duly designated and authorized representative on such carriers of apprentices training to be locomotive engineers. * * *"[12] And second that:

"The dispute between the BLE [Engineers] and the BLF&E * * * is a dispute among employees as to who are the representatives of such employees, within the meaning and intendment of Section 2, subd. Ninth of the Railway Labor Act * * *. * * *"[13]

## II

The view that the Firemen can bargain about the content of an apprenticeship

9. Brotherhood of Railway & Steamship Clerks, etc. v. Ass'n for Benefit of Non-Contract Employees, 380 U.S. 650, 661, 85 S.Ct. 1192, 14 L.Ed.2d 133 (1965).

10. This decision is in apparent conflict with the reason the Board gave for declining the carriers' request for § 5, First, mediation. However, the Board's earlier ruling stated that "[t]he question as posed" was representational. The carriers had indeed posed it as a representational dispute. Thus the Board was merely declining to give an advisory opinion under the guise of mediation on a question which it might later be called upon to determine authoritatively. It was *not* ruling that a § 2, Ninth, dispute was actually presented; it did not have sufficient facts before it to make such a determination.

11. The Engineers sued the Firemen, the Board and the six carriers who are appellees here, asking that (1) the Firemen and the carriers be enjoined from bargaining over the § 6 notice and (2) the Board be ordered to decide the dispute. The carriers, essentially nominal defendants, answered and cross-claimed against the Firemen, asking that the § 6 notice be declared non-bargainable and that the Firemen be enjoined from striking to force such bargaining. The court's relief against the Board and the Firemen granted the prayers of both the Engineers and the carriers, so that they are appellees here.

12. 284 F.Supp. at 351.

13. *Ibid.*

program only if they represent the apprentices is based on an overextension of Virginian Railway Co. v. System Federation No. 40, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789 (1937). In *Virginian Railway* a dispute existed among the carrier's employees whether they were represented by a company union or by a union affiliated with the American Federation of Labor. The Mediation Board certified the A.F.L. union in a Section 2, Ninth, proceeding. The carrier continued to bargain with the company union. Upholding an injunction against this bargaining, the Supreme Court held:

" * * * The obligation imposed on the employer by § 2, Ninth, to treat with the true representative of the employees as designated by the Mediation Board * * * is exclusive. It imposes the affirmative duty to treat only with the true representative, and hence the negative duty to treat with no other. * * * " [14]

The duty to treat with "the true representative" of employees and "with no other" must be read in the context of the facts in *Virginian Railway*. There the Mediation Board had already determined that one union was the representative of the only employees concerned. The company union properly represented nobody. Hence the carrier could not bargain with the company union without derogating from the representative status of the certified union.

Here the facts are very different. The Mediation Board has not certified which union is the true representative of "apprentice locomotive engineers." As we discuss more fully below, it was quite correct in refusing to make such a certification. Thus, in bargaining with the Firemen over the terms of the apprentice engineer program, the carriers would not have derogated from the Engineers' status as certified representative of locomotive engineers, unless in some way such bargaining violated the carriers' collective agreement with the Engineers. But if this latter were the case, the Engineers' proper remedy lay not in the courts or before the Mediation Board, but rather in a proceeding under Section 3 of the Act before the National Railroad Adjustment Board.[15] In short, no representative had been certified for "apprentice engineers." In such a situation, any union for whom future apprentices were "fairly claimable" as part of that union's craft or class could legitimately bargain with the carriers about the terms and conditions under which such future engineers would work.[16]

Consideration of the history of the relationship between the Firemen and the Engineers leads to the conclusion that the Firemen had a reasonable expectation that they might finally represent at least some future employees falling within the as yet largely empty category of "apprentice engineers." [17] Though logic

14. 300 U.S. at 548, 57 S.Ct. at 600.

15. 45 U.S.C. § 153 (1964). Section 153, First (i), gives the National Railroad Adjustment Board jurisdiction to decide "disputes between an employee or group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions" upon petition by either party. When such disputes involve a second union, the N.R.A.B. has the duty to consider the claims of the second union. Transportation-Communication Employees Union v. Union Pacific R. Co., 385 U.S. 157, 87 S.Ct. 369, 17 L.Ed.2d 264 (1966).

16. *Cf.* Meat and Highway Drivers, etc., Local 710 v. N.L.R.B., 118 U.S.App.D.C. 287, 335 F.2d 709 (1964).
The question of which proposals are bargainable is one which, under the Railway Labor Act, may be decided by the courts. By their very nature, such questions cannot be settled by collective bargaining, and the Act does not provide for their settlement by either the National Mediation Board or the National Railroad Adjustment Board.

17. This is not to cast doubt on the Engineers' status as representatives of the apprentices actually employed by the L & N. The point is rather that, after the Firemen have had a chance to bargain

may point toward the Engineers' union representing all apprentice engineers, history as well as logic plays a large part in labor relations in the railroad industry. Historically, the Firemen's union had represented all persons learning to be engineers, because persons learned to be engineers while working as firemen. Whether the change from pure on-the-job training to a more formalized apprenticeship program will completely eliminate the Firemen from a representative role thus is a question at least open to doubt.

The fact that it was reasonable for the Firemen to claim some role in representing apprentice engineers is concretely illustrated by the joint proposals of the Firemen and the Engineers made as recently as 1960. Those proposals, which the two unions agreed upon, contemplated a graduated program in which the employee would move through four stages: locomotive helper (trainee), locomotive helper, locomotive helper (apprentice engineer), and locomotive engineer. Elsewhere in the proposals, "helpers" were equated with firemen. Thus the scheme contemplated representation by the Firemen through three of the four stages.[18]

Further, and quite apart from any claim on the part of the Firemen to possible representation of future apprentices, the Firemen were the certified representatives of a group of employees with a strong economic interest in the nature of any apprentice engineer program. The existing firemen employees of the carriers had traditionally looked forward to eventual promotion to the engineer seniority list, and, by progress up that list, to status and pay as operating engineers. Yet the injection of a separate apprentice program for the training of engineers would clearly reduce the individual fireman's chances of reaching that goal.

Under the agreement between the Engineers and the L & N, the nature of the apprenticeship program was left to management discretion. Management instituted a 90-day training program, at the end of which trainees would be qualified as engineers. The Firemen proposed a much longer training program extending over three years. Whatever the merits of the latter proposal, it can certainly be seen as economic protection for firemen not yet on the engineer seniority list. It would delay the infusion of new engineer recruits into those lists for three years, thus allowing present firemen a first crack at available engineer jobs.

Whether the Firemen's interest in the length and seniority provisions of any engineer apprenticeship program qualifies as a bargainable interest is governed by Order of Railroad Telegraphers v. Chicago & North Western R. Co., 362 U.S. 330, 80 S.Ct. 761, 4 L.Ed.2d 774 (1960). In *Telegraphers* the carrier proposed to eliminate certain railroad stations, and the jobs that went with them, for reasons of efficiency. The union proposed a provision that no existing jobs be eliminated except by agreement between the carrier and the union. The carrier refused to bargain, taking the position that that this work preservation proposal did not involve "conditions of employment," but rather invaded the exclusive prerogatives of management. The Supreme Court held that the proposal, which related to the "job security" of the union's members, was bargainable. It went on to state:

> " * * * [T]he trend of legislation affecting railroads and railroad em-

over the nature of the apprenticeship program, some apprentices at some stage of the program might appropriately be represented by the Firemen.

18. The Presidential Commission which was constituted to attempt a settlement of the work rules dispute of the early 1960's took note of the need for new sources of engineers, and recommended that:

"a joint committee should be established composed of representatives of the Carriers and *the Organizations representing engine service employees.* This Committee would consider the development of a training program which would adequately meet the long run need for future trained engineers." (Emphasis added.)

ployees has been to broaden, not narrow, the scope of subjects about which workers and railroads may or must negotiate and bargain collectively. Furthermore, the whole idea of what is bargainable has been greatly affected by the practices and customs of the railroads and their employees themselves. It is too late now to argue that employees can have no collective voice to influence railroads to act in a way that will preserve the interests of the employees as well as the interests of the railroad and the public at large." [19]

Here, even assuming that the Firemen will never represent any of the apprentice engineers, present firemen have a "job security" interest in the length and size of the apprenticeship program. Their union has long bargained with the carriers over the process of turning firemen into engineers.[20] In the past they have even bargained to restrict carriers' practice of bringing in outside engineers to fill vacant jobs.[21] Thus their historical expectation of promotion to the job of engineer is a "term or condition" of their employment which their union may legitimately bargain to protect.

· [3] Therefore, we conclude that the Firemen's Section 6 notice concerning engineer apprenticeship programs, served on appellee carriers during 1965, was bargainable under the Railway Labor Act.

The National Mediation Board's scheduling of mediation over the notice was proper under Section 5 of the Act. The District Court's order relieving the carriers of their duty to bargain over the notice must be set aside.

### III

The District Court also ordered the National Mediation Board to investigate the dispute and certify to the parties "whether apprentices being trained to become locomotive engineers come within the craft or class of locomotive engineers * * * or within the craft or class of locomotive firemen * * *, if either."[22] The court's order was based upon Section 2, Ninth, of the Railway Labor Act, which provides that the Board shall. "investigate" and decide disputes "among a carrier's employees as to who are the representatives of such employees." The Board had denied the Engineers' request that it settle the dispute under Section 2, Ninth.

As the Supreme Court has noted, Section 2, Ninth, was designed to "resolve a wide range of jurisdictional disputes between unions or between groups of employees." [23] On the other hand, some inter-union disputes are "left to those voluntary processes whose use Congress ha[s] long encouraged to protect these arteries of interstate commerce from in-

---

19. 362 U.S. at 338, 80 S.Ct. at 765.

20. For example, the Firemen's collective agreement with the St. Louis Southwestern Railway Company contains the following provisions:
    "62–1. Firemen shall rank on the firemen's roster from the date of their first service as firemen when called for such service except as provided in Article 62–11, and when qualified shall be promoted to positions as engineers in accordance with the following rules:
    "62–2. Firemen shall be examined for promotion according to seniority on the firemen's roster, and those passing the required examination shall be given certificates of qualification, and when promoted, shall hold their same relative standing in the service to which assigned."

21. While the railroads were under federal control during World War I, firemen complained that their promotional chances were being impaired by the carriers' practice of hiring outside engineers over the heads of their own firemen with many years' seniority. As a result, the industry adopted the "Chicago Joint Agreement," which regulated this practice. When the railroads returned to private control, the provisions of the Chicago Joint Agreement were retained through collective bargaining.

22. 284 F.Supp. at 353.

23. General Committee of Adjustment, etc. v. Missouri-Kansas-Texas R. Co., 320 U.S. 323, 336, 64 S.Ct. 146, 152, 88 L. Ed. 76 (1943).

dustrial strife." [24]   And as this court has recognized, "the Board has no power under Section 2, Ninth, to decide a jurisdictional dispute merely as such." [25]

The language of Section 2, Ninth, describes with some precision the nature of the "inter-union" or "jurisdictional" disputes which the section covers. The Board is to decide disputes "among a carrier's employees as to who are the representatives of such employees." The statute describes the manner in which the dispute is to be settled. The Board may use a secret ballot, or "utilize any other appropriate method" of determining the "choice of representatives by the employees without interference, influence, or coercion exercised by the carrier." [26]

The regulations promulgated by the Board under Section 2, Ninth, conform to the natural reading of the statutory language. To invoke the Board's Section 2, Ninth, powers, a union challenging another union's right to represent a class or craft must present authorization cards showing that employees within the class or craft support the invoking union.[27] Further regulations set out the number of authorization cards which must be presented before the Board will hold an election.[28] Thus the regulations, like the statute, contemplate that when within an existing group of employees some wish to be represented by one union and some by another, the Board is to decide which union is "the true representative."

The situation presented to the Board in this case deviated widely from the sort of dispute contemplated by Section 2, Ninth. The Engineers applied to the Board for a Section 2, Ninth, decision as to who represented the apprentice engineers recently hired by the L & N (the only carrier to have actually hired apprentices).  It will be recalled that the L & N apprenticeship program was instituted pursuant to an agreement with the Engineers, which left the content of the program to management discretion. These apprentices were to be represented by the Engineers. The carriers thought so, the union thought so, and apparently the apprentices thought so. No authorization cards were brought to the Board showing a dispute *among* the apprentices over who represented them. Nor was this a mere technical failing; no one has claimed before the Board, before the District Court, or before us, that any such dispute could have been shown.

There was undoubtedly a dispute between the two unions which revolved generally around the apprenticeship program. For instance, the Firemen thought that the L & N should bargain over the Firemen's proposal; the Engineers and the L & N thought not. In that the unions represent their members, this was a dispute among employees of the carrier. The fireman employees thought they had a bargainable interest in the apprenticeship program; the engineer employees thought not. But no single employee was in dispute with another employee over who did or should represent a group to which they jointly belonged.

Thus the Board's decision that it did not have Section 2, Ninth, jurisdiction was firmly supported by the language of the statute and by the scheme erected to administer it. In addition, of course, the Board's construction of its own jurisdictional statute deserves substantial deference.[29] If more is needed, sound policies rooted in the Railway Labor Act supported the Board's decision.

24.  *Id.* at 337.

25.  Brotherhood of Railroad Trainmen v. National Mediation Board, 77 U.S.App. D.C. 259, 263, 135 F.2d 780, 784 (1943) (concurring opinion of Rutledge, J.).

26.  45 U.S.C. § 152, Ninth.

27.  29 C.F.R. § 1203.2 (1968).

28.  29 C.F.R. § 1206.2 (1968).

29.  Udall v. Tallman, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965) ; *cf.* S. E. C. v. National Securities, Inc., 393 U.S. 453, 467–468, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969).

■ When the Board makes a craft or class determination concerning a group of employees, it does so partly on the basis of the kind of work those employees are doing.[30] If their work looks more like the work traditionally done by firemen, that cuts in favor of certifying them as firemen; if it looks more like engineers' work, the Engineers' union is more likely to be certified as the representative.

Here, the Board could not yet know the nature of what work, if any, the apprentices would be doing. To that extent, it was disabled from making a proper Section 2, Ninth, class or craft determination. True, apprentices were employed on the L & N. But that program had been worked out solely between the carrier and the Engineers. The Firemen had not yet been able to bargain about the nature of the program. The Board could not fairly make its determination on the basis of a program respecting which only one of the two competing unions had had its say. To have done so would have in effect accepted a *fait accompli* achieved only because the carrier had improperly refused to bargain with the Firemen.

It may be that the Firemen have sufficient bargaining power to win some concessions from the carriers concerning apprentice training. Perhaps a longer apprenticeship program can be won, a less formal program involving more on-the-job training. Perhaps the suggestion in the Firemen's original proposal that the program be regarded as a training program for enginemen generally (that is, firemen and engineers) might be implemented in part or in whole.[31] Any of these changes might alter the Board's ultimate Section 2, Ninth, determination as respects representation of apprentices. Finally, the unions might achieve some

degree of harmony in tripartite bargaining and mediation with the railroads. And some joint-union apprenticeship plan, akin to that proposed in 1960, might obviate the need for any Section 2, Ninth, determination at all.

■ These policy considerations demonstrate why it would be premature for the Board to decide now who represents apprentice engineers. These policies, the literal language of the statute, and the Board's own reading of it, all lead toward the conclusion that the Board presently lacks jurisdiction under Section 2, Ninth, to determine the representative of apprentice locomotive engineers.

Accordingly, the District Court's injunction ordering the Board to decide the dispute must be vacated. The District Court orders enforcing its basic decree, from which the Firemen have sought interim relief, must be vacated along with the decree itself.

Reversed.

BURGER, Circuit Judge, with whom Circuit Judge TAMM joins, concurring:

I concur in the result reached and add these comments to clarify the basis upon which I rely.

■ The arguments advanced by the Carriers and the Engineers are very persuasive as to what kind of statute the public interest called for, as the instant case and others abundantly illustrate. Unfortunately, however, an inadequate statutory scheme leaves the problems posed by this litigation "falling between two stools." The absence of existing apprentices seems to preclude there being a "representational" dispute within the meaning of Section 2, Ninth. As for the two presently operating apprentice programs Section 2, Ninth once again appears unavailing since there is no dispute among those apprentices as

---

30. *See* Brotherhood of Railway & Steamship Clerks, etc. v. Ass'n for Benefit of Non-Contract Employees, *supra* Note 9, 380 U.S. at 662–665, 85 S.Ct. 1192.

31. The Firemen's § 6 notice included a definition of "apprentice" as "a person

who is engaged in learning the craft of Locomotive Engineman." In fact there is no such recognized craft, as the District Court found, 284 F.Supp. at 346. The terms "engineman" or "engine service employee" refer to the joint class of firemen and engineers.

to who their representative is. Finally, since none of the parties claim that the instant dispute arises under their respective collective bargaining agreements, it appears that the National Railroad Adjustment Board does not have jurisdiction. Thus, despite a clearly expressed broad Congressional intent that "(a)ll disputes * * * be considered with all expedition" 45 U.S.C. § 152, Second, the shippers—and the public, which ultimately bears the burdens of all such conflicts—must continue to pay a heavy cost for the futile controversy which has engaged the courts and numerous litigants for so long.

Added to this, we cannot be unmindful that for over thirty years the Mediation Board has construed the statute as not vesting in it the powers which Appellees urge. The controversies which led to the creation of Board 282 and subsequent events might well cause some doubts in Congress as to the Board's construction of the statute, but this cannot encourage us, as admittedly is often done by judges, to read the statute—a euphemism for re-writing it—as we think Congress should have drafted it. That the course we are compelled to follow may well prolong this unhappy history of wasteful strife is a matter within the power and province of Congress.

The broad claims of the Firemen concerning the historical connection between their craft and the training of railroad engineers deserves some comment. The Firemen were indeed the source of most of those who became railroad engineers, but they were the "pupils," not the teachers; the Engineers trained and taught the Firemen so that they could qualify for engineer jobs when available. To what extent this gives the Firemen a "bargainable interest" in the apprenticeship training program of the Carriers is not clear, but we are not called upon now to define its scope.

Moreover, if anything is clear from the history which preceded Board 282 it is that due to gradual technological changes the traditional functions of the Firemen had become largely obsolete, but the carriers, shippers and the public were not relieved of the burden of unneeded employees. To remedy this problem Congress created Board 282; after lengthy hearings the Board permitted the carriers to extinguish up to ninety percent of the Firemen's jobs. Although the 282 Award has, by its terms, expired, this Court has recognized that its obvious legislative intent has not thereby lost its vitality.[1] The primary interest of the Firemen at this juncture is to ensure that their promotional rights are not impaired by having graduate apprentices supersede existing firemen in their quest to become engineers. History and logic, then, may well point toward confining the "bargainable interest" of the Firemen solely to the *effect* and not the internal structure of the apprentice programs; this is not to say that both of the contending Unions may not have some contribution to make within the framework of their experience.

Today's result places the carriers in the unhappy position of having to deal simultaneously with two rival unions whose bargaining demands will very likely conflict if a high order of union statesmanship is not forthcoming. Moreover, since both Unions have now been given the right to serve Section 6 notices, the disappointed Union will have the right to strike once the statutory procedures are exhausted. The Carriers will be able neither to avoid nor to resolve a strike by agreeing with the striking union without the risk of violating its obligation not to depart unilaterally from its agreement with the other Union. Although I consider this to be a wholly unsatisfactory resolution I can find nothing in the statute which permits the Court to impose a different result.

1. *See* Brotherhood of L.F.E. v. Bangor & Aroostook R.R. Co., No. 20,472 (D.C.Cir. decided February 28, 1969); Brotherhood of Railroad Trainmen v. Akron & B.B. R.R. Co., 128 U.S.App.D.C. 59, 385 F.2d 581 *passim* (1967), cert. denied, 390 U.S. 923, 88 S.Ct. 852, 19 L.Ed.2d 983 (1968).