**LOCAL 742, UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA, et al., Petitioners,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

J. L. Simmons Company, Intervenor.

No. 73–1120.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 21, 1974.

Decided March 4, 1976.

Bernard M. Mamet, Chicago, Ill., for petitioner.

Jay E. Shanklin, Atty., N. L. R. B., Washington, D. C., of the bar of the United States District Court for the District of Columbia, pro hac vice, by special leave of court, with whom John S. Irving, Deputy General Counsel, Patrick Hardin, Associate Gen. Counsel, and Elliott Moore, Asst. Gen. Counsel, N. L. R. B., Wasington, D. C., were on the brief, for respondent. Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., Washington, D. C., at the time the record was filed, also entered an appearance for respondent.

S. Richard Pincus, Chicago, Ill., of the bar of the Supreme Court of Illinois, pro hac vice, by special leave of court, with whom Milton A. Smith, Richard B. Berman and Gerard C. Smetana, Washington, D. C., were on the brief, for The Chamber of Commerce of the United States of America as amicus curiae.

Paul G. Gebhard, Chicago, Ill., entered an appearance for intervenor J. L. Simmons Co.

Before McGOWAN, ROBINSON and ROBB, Circuit Judges.

McGOWAN, Circuit Judge:

As critical, as it is subtle and difficult, is the distinction in labor law between "primary" and "secondary" activity. It is one that must be drawn by the National Labor Relations Board and reviewing courts in determining whether a labor union has violated the statutory ban on secondary boycotts. National Labor Relations Act § 8(b)(4)(B), 29 U.S.C. § 158(b)(4)(B); see National Woodwork Manufacturers Association v. NLRB, 386 U.S. 612, 645, 87 S.Ct. 1250, 1268–1269, 18 L.Ed.2d 357, 378–379 (1967). The Board has, for a number of years, applied a per se "right to control" test in adjudicating Section 8(b)(4)(B) charges. Under that test, the Board, even after it concludes that a union's refusal to work was for the purpose of preserving work that has historically and traditionally been performed by the unit, will nevertheless find the activity to be secondary if the employer did not have the legal right to control assignment of the disputed work. See, e. g., Deangulo & Local Union No. 98 (York Corp), 121 NLRB 676, 685–86 (1958); Pipe Fitters, Local 120, 168 NLRB 991, 992 (1967).

In its initial decision in this case, the Board applied its right to control test and

found the union in violation of Section 8(b)(4)(B). 178 NLRB 351 (1969). On review here, a division of this court found the Board's use of the *per se* right to control test invalid and remanded the case to the Board for an adjudication of the 8(b)(4)(B) charge "under all the surrounding circumstances," including the facts concerning right to control assignment of the disputed work. *Local 742, Carpenters v. NLRB,* 144 U.S.App.D.C. 20, 444 F.2d 895, 903, *cert. denied sub nom. J. L. Simmons Co. v. Local 742, Carpenters,* 404 U.S. 985, 92 S.Ct. 447, 30 L.Ed.2d 371 (1971). The Board, claiming that it had looked at all the relevant circumstances, again found a Section 8(b)(4)(B) violation. 201 NLRB 70 (1973). The union then sought further review in this court, arguing that the Board had actually reapplied the right to control test and that the Board's decision was not supported by substantial evidence in the record.

While the case was pending, the court agreed to hear en banc another case, *Enterprise Association, Local 638 v. NLRB,* 172 U.S.App.D.C. 225, 521 F.2d 885 which involved the issue of the validity of the Board's use of the right to control test; and disposition of the present review petition was delayed to await the outcome of the en banc proceeding. *Enterprise,* decided July 1, 1975, reaffirmed the prevailing rule in this [1] and other circuits [2] that "the right to

control test misconstrues Section 8(b)(4)(B) as interpreted by the Supreme Court in *National Woodwork Manufacturers Assn. v. NLRB."* 521 F.2d 885, 888, *cert. granted,* 424 U.S. 908, 96 S.Ct. 1101, 47 L.Ed.2d 311, 44 U.S.L.W. 3462 (1976).

The case *sub judice* thus presents this court with its first post-*Enterprise* opportunity to review the Board's analysis of "all the surrounding circumstances" in a case that would otherwise have been determined on the basis of the right to control test. We conclude that the Board's findings are not supported by substantial evidence in the record, and that its order under review must be set aside.

### I

In July, 1966, the J. L. Simmons Co., Inc. (Simmons) signed a contract with the Decatur and Macon County Hospital Association (Hospital Association) for the purchase of materials for and the construction of additions to the Hospital Association's Decatur, Illinois facilities. Simmons, as the general contractor, hired a number of Local 742 carpenters to perform appropriate carpenter duties on the project.[3] At the time the contract was signed, it called for installation of several hundred wood doors,[4] a task that might have been expected to provide considerable work for the carpenters since wood door installation traditionally involves

---

1. *Local 742, Carpenters v. NLRB, supra; Local 636, Plumbers & Pipefitters v. NLRB,* 139 U.S. App.D.C. 165, 430 F.2d 906 (1970).

2. *Western Monolithics Concrete Prods., Inc. v. NLRB,* 446 F.2d 522, 526 (9th Cir. 1971); *Beacon Castle Square Bldg. Corp. v. NLRB,* 406 F.2d 188, 192 n. 10 (1st Cir. 1969) (*dictum*); *American Boiler Mfrs. Ass'n v. NLRB,* 404 F.2d 556, 561 (8th Cir. 1968); *NLRB v. Local 164, IBEW,* 388 F.2d 105, 107–10 (3d Cir. 1968); *see NLRB v. Local 28, Sheet Metal Workers,* 380 F.2d 827, 830 (2d Cir. 1967). *But see Associated General Contractors v. NLRB,* 514 F.2d 433, 437–38 (9th Cir. 1975) (dictum). *Contra, George Koch Sons, Inc. v. NLRB,* 490 F.2d 323 (4th Cir. 1973).

3. At the time of the project, Simmons had no direct contractual relationship with Local 742. Simmons did have a contract, however, with the International United Brotherhood of Carpenters and Joiners of America, Local 742's

parent international union. 178 NLRB 351, 355 (Trial Examiner's decision). The contract between Simmons and the United Brotherhood required Simmons to observe the working conditions and wages prevailing in the local community. The contract also contained the following two clauses: "Any Employer who sublets any of his work must sublet such work in accordance with the current procedural rules of the Nat'l Joint Board in effect at the time a dispute may occur. Any Employer who sublets any of his work must sublet such work subject to the provisions concerning wages, hours and working conditions as hereinafter set forth in this contract." *Id.;* Appendix at 145–46.

4. The original specifications issued to interested bidders by the Hospital Association's architect included a provision for installation of premachined plastic-clad doors and a "deduct alternate" that gave the Hospital Association the option to replace the plastic-clad doors with wood doors. In order to qualify for certain

prior preparation (trimming, cutting, routing, mortising) as well as actually hanging the doors.[5]

The Hospital Association, however, expressly reserved in the contract the option to switch to more expensive premachined plastic-clad doors if adequate financing became available. On August 15, 1966, the Hospital Association and Simmons agreed to substitute premachined plastic-clad doors for the originally specified wood doors. And in mid-November of 1967, approximately eighty of the premachined plastic-clad doors arrived on the construction site.

Simmons apparently recognized that installation of factory prepared doors would cause some controversy with the union, for Simmons wrote to its attorneys on November 18, 1967 concerning these premachined doors and "the Philadelphia precut door case," obviously referring to *National Woodwork Manufacturers Association, supra*. Meanwhile, one of the members of Local 742 brought the premachined doors to the attention of John Foreman, business representative of Local 742. Foreman consulted the union's attorney, who advised Foreman that the union had "the right to refuse to install these doors [to] protect the dimunition [sic] of the bargaining unit," and that the union should offer to install the eighty doors if Simmons would agree to cancel the balance of the order.

Pursuant to this advice, Foreman met with Neal, Vice-President of Simmons, on December 1, 1967 to discuss installation of the factory prepared doors. Foreman argued at the meeting that the union carpenters had been deprived of bargaining unit work and that the door preparation was being done by factory carpenters employed at a lower wage than Local 742 carpenters. Neal argued that Simmons had "no control" over choice of the doors since the contract had specified premachined plastic-clad doors. Neal also informed Foreman that the contract required a lifetime guarantee on all plastic-clad doors, and that the supplier of the doors refused to give more than a one-year guarantee on any plastic-clad door that had been prepared or adjusted at the jobsite.[6] Foreman and Neal failed to resolve the controversy, and they decided to leave settlement of the issue up to their attorneys.

On December 11, 1967, Simmons's job superintendent asked some Local 742 carpenters to install premachined doors in the intensive care unit of the building. The carpenters refused, and later that day the attorney for Simmons called the attorney for the union concerning the concerted refusal to hang the doors. The union's attorney, after expressing surprise upon learning from Simmons's attorney that the contract specified premachined doors,[7] stated that

federal grant monies by lowering the price of the project, the Hospital Association's architect negotiated with Simmons, the lowest bidder, to provide for acceptance of the wood door option. Thus, although the original specifications called for installation of premachined plastic-clad doors, the initial contract called for installation of wood doors. *See* App. at 31–35, 123–24.

5. There is some disagreement over whether the job specifications (*see* App. at 159–62) called for premachined wood doors as opposed to blank wood doors to be prepared at the jobsite. Both Simmons and the Trial Examiner take the position that the wood doors were not to be premachined. *See* 178 NLRB at 354 & n. 3. The Board, on the other hand, would conclude that wood doors were to be premachined. *Id.* at 351 n. 4. We do not find it necessary to resolve the dispute, for in either event the un-

ion could *legitimately expect* that it would perform work that no one disputes has historically and traditionally been unit work, namely, preparation of wood doors. *See id.* at 358 (Trial Examiner's decision); 201 NLRB at 72 (Member Fanning, dissenting).

6. The door supplier generally gives a one-year guarantee on blank wood doors—that is, wood doors prepared at the jobsite. See App. at 41. The record is not entirely clear as to whether this supplier will give a life-time guarantee on premachined wood doors. *See* App. at 39, 41.

7. No doubt the attorney for the union realized that the union could no longer rely squarely on *National Woodwork Manufacturers Association v. NLRB, supra,* since the Supreme Court expressly noted that it did not have before it the issue "whether the Board's 'right-to-control

the union did not intend a product boycott. The attorney for Simmons then apparently rejected an offer by the union's attorney calling for installation of all the premachined doors upon payment of premium pay to the carpenters by Simmons. On December 15, 1967, Simmons filed the unfair labor practice charges that are the subject of the instant case. With the legal issues before the Board for resolution, Foreman eventually authorized the Local 742 carpenters to begin installing the premachined doors.[8]

II

 Section 8(b)(4)(B) bars "as a secondary boycott union activity directed against a neutral employer, including the immediate employer when in fact the activity directed against him was carried on for its effect elsewhere." *National Woodwork Manufacturers Association v. NLRB, supra,* 386 U.S. at 632, 87 S.Ct. at 1262, 18 L.Ed.2d at 371. If a dispute is "addressed to the labor relations of the contracting employer *vis-a-vis* his own employees," the union's activity is protected primary activity despite the fact that it will inevitably have an adverse impact on secondary employers. *Id.* at 627, 645, 87 S.Ct. at 1268, 18 L.Ed.2d at 378; *see Enterprise Association, Local 638 v. NLRB, supra,* 521 F.2d at 900–01. Included within the category of protected primary activity are union efforts to preserve traditional unit work. *National Woodwork Manufacturers Association v. NLRB, supra,* 386 U.S. at 646, 87 S.Ct. at 1269, 18 L.Ed.2d at 379. But if an object of the union activity is "one proscribed by the statute, the action will be condemned even though it might also have legitimate labor objectives." *NLRB v. Local 164, IBEW,*

388 F.2d 105, 108 (3d Cir. 1968); *see NLRB v. Denver Building and Construction Trades Council,* 341 U.S. 675, 689, 71 S.Ct. 943, 952, 95 L.Ed. 1284, 1295 (1951) ("It is not necessary to find that the sole object of the strike [be unlawful]").

The Board concluded that there was "scant evidence that a primary dispute existed over 'genuine work preservation'," but that there was substantial evidence to establish a secondary purpose in the union's refusal to install premachined doors. 201 NLRB at 71 (1973). Our task then, is to determine whether the Board's findings are supported by substantial evidence in the record. National Labor Relations Act, § 10(e), (f), 29 U.S.C. § 160(e), (f) (1970).

A. *The Evidence Concerning a Work Preservation Objective.*

 We begin with the Board's findings with respect to the absence of a primary work preservation objective. The Board noted that there is "no direct evidence that plastic-clad doors have ever, much less traditionally, been installed" by members of Local 742. 201 NLRB at 71. According to the Board, the only record evidence favorable to the union in this regard is an "unsupported assertion" by business agent Foreman that members of Local 742 had prepared and installed plastic-clad doors (manufactured by the same supplier involved in the instant dispute) for Simmons. 201 NLRB at 71–72. The assertion was certainly not unsupported; Neal, the Vice-President of Simmons, testified that this fact was "just exactly right." App. at 66. Moreover, Neal also testified that plastic-clad doors had been prepared for installa-

doctrine—that employees can never strike against their own employer about a matter over which he lacks the legal power to grant their demand'—is an incorrect rule of law inconsistent with . . . *Labor Board v. Insurance Agents' International Union,* 361 U.S. 477, 497–98 [80 S.Ct. 419, 431–432, 4 L.Ed.2d 454, 469]." 386 U.S. at 616–17 n. 3, 87 S.Ct. at 1254, 18 L.Ed.2d at 362. And although Simmons interpreted this footnote as indicating possible approval of the Board's *per se* test, this court has taken the position that the Supreme Court's " 'reservation' of the control

question is better understood as a warning that the opinion not be read as impliedly *approving* the Board's right to control doctrine." *Enterprise Ass'n, Local 638 v. NLRB, supra,* 521 F.2d at 893 n. 14 (emphasis in original).

8. During December of 1967, Local 742 carpenters had installed several premachined doors in the hospital's cardiac intensive care unit because of the urgent need to have that part of the facility completed as soon as possible. App. at 70, 86.

tion at a Simmons construction site in Carbondale, Illinois by a different local of the Brotherhood of Carpenters.[9]

But even if we assume that the Board was correct in concluding that there was no evidence that carpenters had ever prepared plastic-clad doors for installation, we would not necessarily conclude that preparation of such doors involved other than traditional unit work. The question is not whether carpenters have ever worked on plastic-clad doors before, but whether the work involved in preparing plastic-clad doors for installation is the *type* of unit work which carpenters have traditionally performed.[10] "Activity . . . which directly protect[s] *fairly claimable* jobs [is] primary under the Act." *Meat and Highway Drivers, Local 710 v. NLRB*, 118 U.S. App.D.C. 287, 335 F.2d 709, 713 (1964) (emphasis added); *see Local 636, Plumbers & Pipefitters v. NLRB*, 139 U.S.App.D.C. 165, 430 F.2d 906, 911 (1970); *cf. Brotherhood of Locomotive Firemen & Engineermen v. National Mediation Board*, 133 U.S.App.D.C. 326, 410 F.2d 1025, 1029–32, *cert. denied*, 396 U.S. 878, 90 S.Ct. 149, 24 L.Ed.2d 136 (1969). Otherwise, employee rights would be lost whenever new advances in technology or industry practice altered the nature of a product but not the type of work required to install it. *Cf. Local 742, Carpenters v. NLRB, supra*, 444 F.2d at 902 n. 15.

The evidence in this record indicates that the tasks and skills involved in the preparation of plastic-clad doors are closely related to those involved in traditional carpenter preparation of wood doors.[11] In fact, according to the manufacturer of the plastic-clad doors involved in this case, a "qualified craftsman with the appropriate tools" would have no difficulty in preparing plastic-clad doors at the jobsite for final installation.[12] This evidence, combined with the fact that carpenters had apparently installed non-premachined plastic-clad doors on other projects, led the Trial Examiner to

9. Neal tried to distinguish the Carbondale project by telling Foreman that the specifications on that job required only a one-year guarantee on doors. App. at 68. Since the doors installed on that project were plastic-faced (plastic on both sides of the door) but not plastic-edged, a one-year guarantee is all that the supplier would give; the supplier reserves its life-time guarantee for completely plastic-clad premachined doors. App. at 41. *But see* note 6 *supra*. Although specifications concerning the scope of the guarantee are relevant to the right to control factor, we stress that they have no bearing on the question of the scope of unit work. There is simply nothing in the record that indicates that preparation of *completely plastic-clad* doors requires skills different from or in addition to those involved in the preparation of *plastic-faced* doors. *But see* note 13 *infra*. The Carbondale project is thus one piece of evidence indicating that the work involved in preparing plastic-clad doors for installation is the *type* of work traditionally performed by carpenters.

10. We addressed a somewhat similar question in our en banc opinion in *Enterprise*. The argument was made in that case that unions, when they insist that a subcontracting employer either not bid on a contract or, if he does bid, compensate them for work lost due to prefabrication, are pursuing work *acquisition* rather than work *preservation*. The court explicitly rejected that argument: "[B]y the very nature of subcontract bidding, a subcontractor will always be acquiring work when he bids on a project; the characterization of union activity as having a work preservation objective must therefore depend on whether it is the *type* of unit work which the employees have traditionally performed, not whether they actually performed the particular work in question." 521 F.2d at 895–97 n. 25 (emphasis in original).

11. Plastic-clad doors are essentially wood doors covered with plastic. Preparation of such doors for installation certainly seems to be more like the *type* of work involved in preparing *wood* doors when the *type* involved in preparing *metal* doors, a task which the carpenters have not claimed as traditional unit work. App. at 60.

12. Indeed, there is some evidence in the record which indicates that Local 742 carpenters had reprepared several of the premachined plastic-clad doors in order to install them properly. App. at 109–14. Simmons did not authorize this work by the carpenters, and subsequently ordered the carpenters to set aside rather than reprepare any door that did not fit properly. App. at 111. The reason for this order is not made explicit, but a reading of the entire record suggests that Simmons was concerned that the manufacturer would refuse to issue a life-time guarantee on the doors, and not that the carpenters were unable to do the work efficiently.

find that the work of preparing plastic-clad doors for installation is the "historical and traditional unit work of carpenters at the jobsite."[13] 178 NLRB at 358.

■ In rejecting this finding by the Trial Examiner, the Board stressed that there was undisputed record evidence indicating that members of Local 742 had on one prior occasion installed without objection approximately twelve to twenty plastic-clad doors for a construction company other than Simmons. The Board failed to note, however, that the preparation was apparently completed without the union's knowledge. Moreover, we are unwilling to hold that one incident almost four years earlier involving installation of only twenty premachined plastic-clad doors constitutes a waiver of Local 742's work preservation claim.

■ The Board also emphasized that there is no contract clause guaranteeing to the carpenters the preparation work on doors of any material, and no evidence that such a work preservation clause had ever been discussed in contract negotiations between the parties. We agree with dissenting member Fanning that we can attach "no great significance" to the absence of a specific contract clause covering prepara-

tion of plastic-clad doors "in light of the facts (1) that there is no disagreement that the work in dispute, if to be done on *wood* doors, traditionally has been done by the Union's members on the jobsite and (2) that there is no contract clause governing the handling of this work on wood doors either . . . ." 201 NLRB at 72. Although the absence of a specific work preservation clause is certainly one of the factors to be considered in looking at "all the surrounding circumstances," when examined in light of the other relevant circumstances in this case it lends little support to the Board's finding that there was no primary work preservation objective.[14]

■ A review of the entire record—rather than just the facts isolated by the Board—makes it even more difficult to sustain the Board's conclusion that there was little evidence to indicate a work preservation objective. On numerous occasions union officials discussed the premachined door issue with representatives of Simmons in purely work preservation terms.[15] And, more important, the union offered Simmons a compromise under which the members of Local 742 would install the premachined doors in exchange for premium rates of

13. Although the Trial Examiner concluded that "bevelling, routing, mortising, and cutting for length" involved traditional unit work, Local 742 has decided not to claim the task of bevelling plastic-clad doors. The union apparently recognizes that plastic-clad doors must be bevelled *before* plastic strips are attached by heat and pressure to the edges of the door, and that the carpenters do not have the necessary equipment at the jobsite to attach the plastic edges. Consequently, they are willing to install doors that have been bevelled at the factory. *See* Supp.App. at 9–10.

Plastic strips are not attached to the tops and bottoms of the plastic-clad doors, and once the doors have been cut for length the tops and bottoms are sealed by brushing on a sealant, a task that can be performed at the jobsite. *See* Supp.App. for the Board at 10. But the carpenters apparently do not claim the task of cutting the doors for length. Supp.App. at 21.

14. *See* Local 742, *Carpenters v. NLRB, supra,* 444 F.2d at 903:

If the presence or absence of a specific work preservation agreement is to make a difference, it can only be as one of many "surrounding circumstances" used to determine

what the *union's objective* was. It may be, for example, that when the union acts to enforce a specific clause, its objective more clearly relates to its labor relations with the primary employer. But the absence of such a specific clause is obviously not enough by itself to indicate a secondary objective relating to another employer.
(Emphasis in original.)

15. *E. g.,* App. at 69 (Simmons Vice-President Neal testified that Foreman told him that the carpenters "had been denied the work of prefitting and premachining these doors for hardware"); App. at 149–50 (Foreman indicated that he told Neal at the December 1 meeting that "the work that had been done on the doors at the mill . . . was work that had been done in the past exclusively by members of [the] bargaining unit" and that "it was [Neal's] responsibility to tell the mill . . . to stop doing [the union's] work"); App. at 101 (the attorney for the union stated that he advised Foreman to tell Neal that the carpenters would not hang the doors "because it was bargaining unit work").

pay.[16] Since maintenance of the income level of its members is presumably the objective behind union work preservation efforts, evidence of the proposed compromise is indicative of a primary work preservation intent. *See Enterprise Association, Local 638 v. NLRB, supra,* 521 F.2d at 899 ("Evidence that the union was *unwilling* to permit its members to install the [premachined] units even if they were paid for the work they lost by the [premachining] would call into question [a] finding that the union's objective was merely work preservation . . . .") (emphasis added).

## B. Evidence Concerning Secondary Objectives.

■ Of course, all that is necessary to find a violation of Section 8(b)(4)(B) is that "*an* objective of the union's secondary action, although *not necessarily the only objective,* is to force the secondary employer to cease doing business with the primary party." *Local 419, Carpet Layers v. NLRB,* 151 U.S.App.D.C. 338, 467 F.2d 392, 399 n. 13 (1972) (emphasis in original); *see* cases cited page 689 *supra.* Consequently, we must determine whether there is substantial evidence in the record to support the Board's finding of "union objectives elsewhere." 201 NLRB at 71.

In the portion of its supplemental opinion dealing with Local 742's alleged secondary objectives, the Board first considered Simmons's lack of "control" over the assignment of the disputed work, noting that it still "deem[s] highly relevant to a determination of objective the question as to whether the struck or picketed employer has any power to grant the union's demands." 201 NLRB at 71. The Board then stated: "[I]f the facts demonstrate that there is no possibility that the struck or picketed or threatened employer can resolve the dispute except by either forcing a secondary independently owned and operated business to take some action or by [sic] ceasing to do business with some other entity, then even though the union's conduct can be said to fall, in part, at least, under

the rubric of 'work preservation,' we are inclined to find such a set of facts indicative of 'union objectives *elsewhere.*'" *Id.* By taking this position, the Board has merely changed the status of the lack of "control" factor from a *per se* test to a *prima facie* inference that there is an illegal secondary objective.

■ Although the issue of the validity of the Board's *prima facie* inference approach has not previously been squarely presented to this court, we did have an opportunity to comment on that approach in the course of our en banc opinion in *Enterprise* and disapproved it in no uncertain terms: "[W]e find that, given the virtual impossibility of proving the *lack* of the imputed secondary objective, this 'prima facie' approach in effect constitutes the same old *per se* test which we have condemned in our prior opinions and which contravenes the rationale and spirit of *National Woodwork.*" 521 F.2d at 890 n. 9 (emphasis in original). We adhere to our statement in that case that "an employer's lack of legal control over the work the union seeks to preserve for its members cannot alone be decisive of the legality of the union's objectives. Indeed, we remain convinced that, *absent other evidence that a work preservation strike is actually intended to satisfy illegal secondary objectives, such a strike is lawful primary activity . . . .*" *Id.* at 894 (emphasis added).

■ In reviewing the totality of the circumstances in this case, the Board claims to have found such "other evidence" of illegal secondary objectives. The first piece of "further substantiation" mentioned in the Board's supplemental opinion is that "Simmons was without power to fulfill the desires of the Union to perform the work" and that it was thus "totally impossible for Simmons to carry out its responsibility to install the specified product, as guaranteed by the supplier, without either forcing the Hospital Association and the supplier to change the substance of their agreement as to guarantees—or else to effectuate a ces-

16. App. at 54; 178 NLRB at 356–57 (Trial Examiner's decision); *see* App. at 166–68.

sation of business." 201 NLRB at 71. We fail to see how this evidence constitutes "further substantiation" of illegal secondary objectives since it merely restates the right to control factor, stressing the impact on secondary employers of the refusal to hang the doors. But no matter how "severe the impact of primary activity on neutral employers, it [is] not thereby transformed into activity with a secondary objective." *National Woodwork Manufacturers Association v. NLRB, supra,* 386 U.S. at 627, 87 S.Ct. at 1259, 18 L.Ed.2d at 368.

The second item of "further substantiation" noted by the Board was the fact that both Local 742 and its parent international union had a policy "not to install precut doors," which the Board considered "far more indicative of an objective directed at overall cessation of purchases from neutral manufacturers than at a specific primary dispute between the contractor here and a unit of employees seeking to achieve a desired set of working conditions from their primary employer." 201 NLRB at 71. The existence of such a policy simply cannot be considered evidence of an illegal secondary objective, however, since it is just as consistent with a finding of legitimate primary activity. For example, a union that attempts to preserve bargaining unit work by negotiating an explicit work preservation clause guaranteeing door preparation activity to jobsite carpenters is certainly pursuing a policy against installation of precut doors. But such a clause is presumptively legal, and the clause and the policy do not in themselves indicate an illegal secondary objective. *National Woodwork Manufacturers Association v. NLRB, supra,* 386 U.S. at 644, 87 S.Ct. at 1268, 18 L.Ed.2d at 378. On the other hand, a union that seeks clauses barring installation of precut doors in order to produce an adverse impact on a secondary employer for the purpose of winning benefits for the employees of that employer is in violation of Section 8(b)(4)(B). The actual issue in a Section

8(b)(4)(B) case is not the existence of such a policy, but whether the "Union's objective [in enforcing that policy] was preservation of work . . . , or whether [the boycott was] tactically calculated to satisfy union objectives elsewhere." *Id.* Therefore, we disagree with the Board's conclusion that evidence of such a policy substantiates the existence of illegal secondary objectives.[17]

Finally, the Board concluded that the union's illegal secondary objectives were "further fleshed out" by evidence that the union's business representative had made statements to the representatives of Simmons and to a newspaper reporter expressing concern over the "substandard" wages paid to the employees of the manufacturer of the premachined doors. 201 NLRB at 71. Certainly, the union's concerted refusal to install premachined doors would be unprotected secondary activity if the union intended to pressure the manufacturer of the doors into raising the wages of its employees. But we cannot find substantial evidence in the record to support the Board's finding that Local 742 intended to pressure the door manufacturer (Anderson).

First, Foreman's statements concerning the wages paid to employees of Anderson must be read in light of the fact that the contract governing relations between Simmons and Local 742 contained a subcontracting clause that prohibited Simmons from subcontracting out unit work unless the subcontractor observed the equivalent of union wages. Foreman testified that he discussed the wages received by employees of Anderson only to make it clear that he thought that Simmons was violating this union standards clause. Such clauses are presumptively legal, and enforcement of the clause to preserve the work and standards for which the union has bargained is protected primary activity. *Meat & Highway Drivers, Local 710 v. NLRB, supra,* 335 F.2d at 715–16; *Truck Drivers Local 413 v.*

---

**17.** We note parenthetically that a union policy against installation of all precut doors is more consistent with a finding of a primary work preservation objective than is a union policy of refusing to install only those precut doors supplied by particular manufacturers. *See Enterprise Association, Local 638 v. NLRB, supra,* 521 F.2d at 899–900 & n. 35.

*NLRB,* 118 U.S.App.D.C. 149, 334 F.2d 539, 548, *cert. denied,* 379 U.S. 916, 85 S.Ct. 264, 13 L.Ed.2d 186 (1964); *Building & Construction Trades Council v. NLRB,* 117 U.S. App.D.C. 239, 328 F.2d 540, 541–42 (1964); *Orange Belt District Council of Painters No. 48 v. NLRB,* 117 U.S.App.D.C. 233, 328 F.2d 534, 538–39 (1964); *District 9, International Association of Machinists v. NLRB,* 114 U.S.App.D.C. 287, 315 F.2d 33, 36–37 (1962); *Retail Clerks, Local 770 v. NLRB,* 111 U.S.App.D.C. 246, 296 F.2d 368, 373–74 (1961). Given the potential relevance of the union standards clause, Foreman's statements concerning substandard wages do not necessarily indicate a secondary objective.

Second, there is evidence in the record which indicates that Local 742 and other sister locals of the United Brotherhood of Carpenters had on prior occasions installed doors supplied by Anderson. In fact, the record indicates that on a prior Simmons project Local 742 had installed nonpremachined plastic-clad doors supplied by Anderson. There is simply nothing in the record to indicate any change in this willingness of Local 742 and its sister locals to install Anderson's nonpremachined doors. In this dispute, Local 742 merely insisted that Simmons cancel the balance of the order of premachined doors; the union never so much as even hinted that Simmons should replace those doors with nonpremachined doors supplied by a manufacturer other than Anderson. Indeed, Local 742 expressly noted that it was willing to install plastic-clad doors that had been bevelled at the Anderson factory despite the fact that this task is one which has traditionally been preformed on wood doors by carpenters at the jobsite.[18] This willingness to install both wood and plastic-clad doors that are supplied but not premachined by Anderson is no doubt influenced by the fact that doors manufactured by Anderson carry the United Brotherhood of Carpenters union label.

■ As a final matter, we stress that the Board was in error when it stated that "Simmons was without power to fulfill the desires of the Union to perform the work," 201 N.L.R.B. at 71, and that "[i]t was thus totally impossible for Simmons to carry out its responsibility to install the specified product, as guaranteed by the supplier, without either forcing the Hospital Association and the supplier to change the substance of their agreement as to guarantees—or else to effectuate a cessation of business." *Id.* The Board was aware, as we mentioned earlier, that the union had indicated that it would be willing to install the specified product if Simmons would negotiate the payment of a wage premium for each premachined door installed. Consequently, Simmons had three, rather than two, available options: (1) attempt to effect a change in the substance of the guarantee, (2) cease doing business on the project, or (3) negotiate the payment of a wage premium.[19]

It is our view that the willingness of the union to install the premachined doors in exchange for a wage premium—a willingness that was communicated to Simmons at the very start of the controversy over installation—substantially undercuts the Board's conclusion that the record indicates

---

18. *See* note 13 *supra.*

19. This case differs in this important respect from the *Enterprise* case. In his Petition for a Writ of Certiorari in the latter case, the Solicitor General argues to the Court that the picketed employer "had available only two courses of action: it either could have induced [the general contractor] to change its requirements and specifications for the job, or failing that, could have terminated its subcontract with [the general contractor]." Petition at 12. He reaches that conclusion because in his view there was no indication that the union in *Enter-* prise would have been content if the subcontractor had paid the union members premium pay for working on prefabricated units. Consequently, the Solicitor General takes the position that "[t]here is no occasion [for the Supreme Court] to consider whether there would have been a violation of Section 8(b)(4)(B) had the union merely demanded compensation from the [struck employer]." *Id.* at 12 n. 7. The case *sub judice* raises the precise question bearing on the existence *vel non* of a violation which, according to the Solicitor General, is not present in *Enterprise.*

"union objectives elsewhere." [20] The facts of this case simply do not support a conclusion that "there is no possibility that the struck or picketed or threatened employer can resolve the dispute except by either forcing a secondary independently owned and operated business to take some action or by [sic] ceasing to do business with some other entity . . . ." *Id.* Indeed, resolution of the dispute through negotiation of a wage premium would have enabled the union to achieve its work preservation goal without any direct impact on employers other than Simmons. Surely the refusal of Simmons even to enter negotiations on the wage premium issue does not justify the Board's failure to explain its finding of "union objectives elsewhere" given evidence of the union's willingness to negotiate.

### III

We concluded our en banc opinion in *Enterprise* by noting that although "[t]he Board may fashion its own formulations as to the relevance of certain facts to *National Woodwork's* test for distinguishing primary from secondary activity," it may not "transform that test, directly or indirectly, into a vehicle for subverting the congressional purpose by focusing on only one among many potentially relevant factors." 521 F.2d at 905. Our problem with the Board's opinion in this case is that the right to control factor again appears, by its own force, to have played a decisive role. The Board does not attempt to indicate the "substance, history, and motivation" of the union's alleged dispute with Anderson, and identifies no significant evidence explaining why and in what manner the union intended to affect the labor relations of that employer. Moreover, the Board fails to deal with the significance of the union's willingness to accept premium pay in exchange for installation of premachined doors. In light of the fact that there is only insubstantial evidence in the record to support an 8(b)(4)(B) charge, we set aside the order under review and we remand the case to the Board for dismissal of the charges.

*It is so ordered.*

20. Subsequent to the filing of the unfair labor practice charge by Simmons, the union *renewed* its compromise suggestion concerning premium rates of pay. The union indicated that it would be willing to hang the doors during the pendency of the unfair labor practice charge if Simmons would agree either to pay a specific premium or to negotiate a wage premium in the event the union prevailed in the unfair labor practice charge proceeding. It was only after Simmons failed to respond to these proposals that the union members began installing the doors. *See* text at note 8 *supra*.